DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
emilyrose@siegelyee.com

ANDREA M. HENSON, SBN 331898
LAW OFFICES OF ANDREA M. HENSON
1840 Woolsey St.
Berkeley, CA 94703
Telephone: (510) 977-2511
Email: andreamargarethenson@gmail.com

OSHA NEUMANN SBN 127215
LAW OFFICES OF OSHA NEUMANN
1840 Woolsey St.
Berkeley, CA 94703
Telephone: (510) 717-8604
Email: oshaneumann@gmail.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHERE DO WE GO BERKELEY, on behalf of itself and those it represents; RONNIE BROOKS; JASON MILLER; KINNDRA MARTIN; KEVIN CODDINGTON; JONATHAN JAMES; MARIAH JACKSON; SARAH TEAGUE; TERRY LEE WALKER; JOSE MORFIN; ALEJANDRO MEYERS; and SHAWNA GARCIA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARMENT OF TRANSPORATION (Caltrans), et al. <br><br> Defendants. | Case No.: 21-CV-04435-EMC <br><br> **SECOND AMENDED COMPLAINT** |

**INTRODUCTION**

1.       Plaintiff WHERE DO WE GO BERKELEY ("WDWG BERKELEY") has served encampments of unhoused residents on property owned by the State of California and operated by the CALIFORNIA DEPARTMENT OF TRANSPORTATION ("CALTRANS") for two years. Its mission is to represent, support, and serve the residents of the encampments along the I-80 corridor on the Caltrans right-of-way in Berkeley and Emeryville, and other homeless individuals living in the East Bay. Until August, 2021, the three largest encampments were: (1) the encampment located on land adjacent to the Ashby Avenue off ramp from I-80, which leads to Shellmound Street at the Berkeley Emeryville border ("Ashby Shellmound"); (2) the encampment located west of I-80 at University Avenue in Berkeley ("Seabreeze") and (3) the encampment at University Avenue under the freeway adjacent to the exit ramp, eastbound I-80 ("Downstairs").

2.       In June 2021, CALTRANS noticed the closure of the Ashby Shellmound encampment. A successful temporary restraining order by residents of the encampment postponed the closure. In August 2021, CALTRANS closed Seabreeze and Downstairs.

3.       When CALTRANS closed the encampments at Downstairs and Seabreeze, residents from those encampments who had not been offered alternative shelter or who had disabilities that prevented them from accessing alternative shelter dispersed into the community. Some residents went to the Ashby Shellmound encampment, despite CALTRANS' indication that it intended to close that encampment. Still others went to a more dangerous and less accessible location on the west side of the Ashby Shellmound encampment ("Ashby West"). Some moved into adjacent cities.

4.       Plaintiffs RONNIE BROOKS, TERRY LEE WALKER, JR., and JOSE MORFIN moved to Ashby Shellmound.

5.       Plaintiffs KEVIN CODDINGTON, JONATHAN JAMES, MARIAH JACKSON, SARAH TEAGUE, ALEJANDRO MEYERS, and SHAWNA GARCIA, moved to Ashby West, where plaintiff KINNDRA MARTIN already resided.

6.       Plaintiff JASON MILLER moved into Berkeley.

7.       Many individuals living in the Ashby Shellmound, Ashby West, Downstairs, and

Seabreeze encampments have physical and/or mental impairments and are qualified persons with disabilities as defined by Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). This includes plaintiffs KINNDRA MARTIN, MARIAH JACKSON, SARAH TEAGUE, SHAWNA GARCIA, KEVIN CODDINGTON, ALEJANDRO MEYERS, and JONATHAN JAMES.

8.     CALTRANS receives federal funding and operates a service, program, or activity, within the meaning of 42 U.S.C § 12132, when it clears homeless encampments on its property. Pursuant to its Interim Guidance on Encampments, part of CALTRANS' role in addressing encampments is to collaborate with local partners to help connect residents with critical services and shelter/housing solutions and to offer alternative state land for encampment relocation.

9.     CALTRANS continues to clear encampments in a manner that does not allow sufficient time for outreach workers to work with and place residents into accessible alternative shelter. Caltrans does not accommodate people with disabilities in the clearing of its encampments by allowing them more time to move their belongings, or offering them assistance they need because of their disabilities. As a result, they lose valued possessions that are important for their survival.

10.     CALTRANS has cleared the major encampments along I-80, including Seabreeze and Downstairs, without allowing sufficient time for residents to secure alternative shelter and without offering anywhere that the residents can go. They have cleared encampments while efforts during ongoing to find alternative places where people can safely reside. They have not accommodated people with disabilities, who are harder to place in safe and accessible shelter. Many residents have dispersed widely and are residing in unsafe locations, where they do not have access to services. Other residents have moved to other CALTRANS land, including the Ashby Shellmound encampment and the Ashby West encampment. The Ashby West encampment can only be reached by crossing lanes of fast-moving traffic on the ramps leading to and from  I-80/580.

11.     By closing encampments when people have no place to go by not allowing

sufficient time for outreach workers to contact people being displaced and find them safe, accessible housing, and by leaving people evicted from those encampments no choice but to move to more dangerous locations where the health and safety at risk, Caltrans has placed people whom it has evicted in harm's way. Caltrans has created dangers for their health and safety. These dangers are particularly acute for the many people who have been displaced with no place to go who have serious mental and physical disabilities. People with disabilities are harder to place than people who are able-bodied and of sound mind. They require more time and more intensive assistance because of their disabilities.

12.     By clearing people experiencing homelessness from their encampments before they have been able to access adequate and accessible shelter, by causing them to be dispersed into isolated groups, by leaving them no choice but to shelter in places that are difficult and dangerous to access, Caltrans has made the work of WDWG BERKELEY more difficult and costly and has frustrated its mission of meeting the needs of residents of encampments on CALTRANS' right-of-way.

## JURISDICTION AND VENUE

13.     Jurisdiction is based on 28 U.S.C. Sections 1331 and 1343. This case is brought pursuant to 42 U.S.C. Section 1983 and 42 U.S.C. Section 12132 and raises questions of federal constitutional law and federal statutes. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202.

14.     The state law claims in this action are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution. The Court's jurisdiction over these claims is invoked under 28 U.S.C. § 1367.

15.     Venue is proper in the Northern District in that the events and conduct complained of in this action are occurring in the Northern District.

## INTRADISTRICT ASSIGNMENT

16.     Because this action arises in Alameda County, it is assigned to the Oakland or San Francisco Division.

## PARTIES

17.     Plaintiff WHERE DO WE GO BERKELEY is a 501(c)(3) organization made up of homeless and housing insecure individuals and advocates. WDWG BERKELEY's mission is to serve, support, and advocate for homeless individuals living in the East Bay. WDWG BERKELEY's main focus is to represent, support, and serve encampments along the I-80 corridor on Caltrans' right-of-way in Berkeley and Emeryville, California: (1) The encampment located on land adjacent to the Ashby Avenue off ramp from  I-80, which leads to Shellmound Street at the Berkeley Emeryville border  ("Ashby Shellmound"); (2) the encampment located west of  I-80 at University Avenue in Berkeley ("Seabreeze") and (3)  the encampment at University Avenue under the freeway adjacent to the exit ramp, eastbound I-80 ("Downstairs"). WDWG BERKELEY brings this suit on behalf of itself and on behalf of homeless individuals, whom it is its mission to serve, who are encamped along the I-80 corridor in Berkeley and Emeryville.

18.     Plaintiff RONNIE BROOKS has been homeless in the Bay Area for approximately six years. Mr. BROOKS was a resident of the Seabreeze encampment when it was cleared by CALTRANS. He was not offered accessible alternative shelter when CALTRANS closed the Seabreeze encampment. He is now a resident of Ashby Shellmound West encampment.

19.     Plaintiff JASON MILLER has been homeless in the East Bay for seven years. He was a resident of the Seabreeze encampment when it was closed by CALTRANS. He suffers from post-traumatic stress disorder from his time in prison. Mr. MILLER currently lives at Dwight Street and Fourth Street in Berkeley, CA.  He was not offered accessible alternative shelter when CALTRANS closed the Seabreeze encampment. Mr. MILLER is a qualified individual with a disability within the meaning of the ADA, section 504, and Ca. Gov't code §12926. Mr. MILLER has not been offered accessible housing or a hotel.

20.     Plaintiff KINNDRA MARTIN has been homeless for five years. She is a disabled woman who is diagnosed with bipolar disorder and depression. Ms. MARTIN is a former resident of the Seabreeze encampment and now lives at Ashby Shellmound West. Ms. Martin has not been offered accessible housing or a hotel. Ms. MARTIN is a qualified individual with a disability within the meaning of the ADA, Section 504, and Ca. Gov't code §12926.

21.     Plaintiff KEVIN CODDINGTON has been homeless for 23 years. He is a disabled man who is diagnosed with depressive disorder. He is a former resident of the "Downstairs" I-80 Underpass encampment and the Seabreeze encampment. He currently resides at Ashby Shellmound West. Mr. CODDINGTON is on the permanent supportive housing list but has not been contacted by a worker or a representative. Mr. CODDINGTON is a qualified individual with a disability within the meaning of the ADA, Section 504, and Ca. Gov't code §12926.

22.     Plaintiff JONATHAN JAMES has been homeless for approximately four to five years. He suffers from mild post-traumatic stress disorder from being shot twice. He resided at the Downstairs when CALTRANS closed the encampment and moved to Seabreeze. He was evicted from Seabreeze when CALTRANS closed the encampment. He currently lives at Ashby Shellmound West. Mr. JAMES has not been offered accessible housing or a hotel. Mr. JAMES is a qualified individual with a disability within the meaning of the ADA, Section 504, and Ca. Gov't code §12926.

23.     Plaintiff MIRAH JACKSON has bipolar disorder and post-traumatic stress disorder. She was a resident of the Seabreeze encampment when it was closed by CALTRANS. She now lives at Ashby Shellmound West with her boyfriend. Ms. JACKSON is a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA") and Ca. Gov't code §12926. Ms. JACKSON was offered and accepted a place at the Grayson shelter, but the shelter was not accessible to her due to her disabilities and she lost her spot. She has not been offered accessible housing or a hotel.

24.     Plaintiff SARAH TEAGUE has been homeless on and off for fifteen years. She has clinical depression and receives SSI for her disability. She also has post-traumatic stress disorder and an intestinal problem that can leave her bedridden for days. She was a resident of the Downstairs encampment when it was closed by CALTRANS.  She moved to Seabreeze and was evicted form there when CALTRANS closed that encampment. She currently resides at the Ashby Shellmound West encampment. Ms. TEAGUE has not been offered accessible housing or a hotel. Ms. TEAGUE is a qualified individual with a disability within the meaning of the ADA, Section 504, and Ca. Gov't code §12926.

25.    Plaintiff TERRY LEE WALKER, JR. has been homeless for 29 years. He suffers from adjustment disorder, severe grief, anxiety, and depression. He was a resident of the Seabreeze encampment when it was closed by CALTRANS. He current lives at Ashby Shellmound. Mr. WALKER was offered a place at the Grayson shelter but they could not find his paperwork and turned him away. He has not otherwise been offered accessible housing or a hotel room. Mr. WALKER is a qualified individual with a disability within the meaning of the ADA, Section 504, and Ca. Gov't code §12926.

26.    Plaintiff JOSE MORFIN has been homeless for five years. He suffers from a permanent knee injury that affects his daily activities. He was a resident of the Seabreeze encampment when it was closed by CALTRANS. He has not been offered any housing. Mr. MORFIN currently lives at the Ashby Shellmound encampment.

27.    Plaintiff ALEJANDRO MEYERS has been homeless for approximately 15 years. He suffers from an anxiety disorder. He was a resident of the Seabreeze encampment when it was closed by CALTRANS. He is currently living with his partner, SHAWNA GARCIA, at Ashby Shellmound West. Mr. MEYERS has not been offered accessible housing or a hotel room.

28.    Plaintiff SHAWNA GARCIA has been homeless for approximately twelve years. She is a victim of domestic violence and interpersonal violence. She was a resident of the Seabreeze encampment when it was closed by CALTRANS. She now lives at Ashby Shellmound West. Ms. GARCIA has physical and mental disabilities. She has had surgery on both of her knees. She has arthritis and permanent ligament damage in her ankle. Ms. GARCIA experiences back and shoulder pain. She has depression and anxiety as a result of the history of domestic violence toward her. Ms. GARCIA, a domestic violence victim, was offered a hotel room at the Roadway Inn but could not accept because her abuser and his girlfriend are staying there. Ms. GARCIA is a qualified individual with a disability within the meaning of Americans with Disabilities Act ("ADA") and Ca. Gov't code §12926.

29.    Defendant the CALIFORNIA DEPARTMENT OF TRANSPORTATION is a California State Agency under the laws of the State of California, with the capacity to sue and be sued. CALTRANS receives federal funding.

30.     Defendant TOKS OMISHAKIN is the Director of CALTRANS and is sued in his individual and official capacities. As Director of CALTRANS, defendant OMISHAKIN is responsible for the budget of CALTRANS and its programs and policies statewide, including those programs and policies regarding encampments of people experiencing homelessness on CALTRANS property, and specifically responsible for those programs and plans that have impacted WDWG BERKELEY and the people it serves, including people with disabilities.

31.     Defendant DINA EL-TAWANSY is the District Four Director of CALTRANS and is sued in her individual and official capacities. As Director of CALTRANS District Four, defendant El-TAWANSY has jurisdiction over CALTRANS property on which the subject encampments are located. Defendant EL-TAWANSY is responsible for implementing programs and policies regarding encampments of people experiencing homelessness on CALTRANS property in her District, and specifically responsible for the implementation of those programs and plans, which have impacted WDWG BERKELEY and the people it serves including people with disabilities.

## STATEMENT OF FACTS

32.     WDWG BERKELEY was founded because of Bay Area cities' policies and practices of "evicting" and "sweeping" the homeless and clearing homeless encampments without providing homeless encampment residents with shelter, housing, or necessary services.

33.     Out of sheer exasperation and fear of breaking the law, homeless residents asked the simple question of local government "Where do we go?" when individuals are homeless, impoverished, and forced to exist on public land.

34.     Since its inception on September 3, 2019, WDWG BERKELEY has advocated for the constitutional and human rights of the homeless people it serves, has offered them employment, and has provided them with material support such as porta-potties, hand washing stations, tents, tarps, medical support, harm reduction supplies, food, tent heaters, trash removal, clothing, furniture, blankets, clothes and a host of other items they need in order to survive on the streets.

35.     The residents of the encampments  that WDWG BERKELEY serves include the plaintiffs RONNIE BROOKS, JASON MILLER, KINNDRA MARTING, KEVIN CODDINGTON,

JONATHAN JAMES, MARIAH JACKSON, SARAH TEAGUE, TERRY LEE WALKER, JOSE MORFIN, ALEJANDRO MEYERS and SHAWNA GARCIA, and they have come to rely on its support. They also rely on other service and support organizations, which contact them at their encampments and provide them with weekly medical services, harm reduction supplies, legal services, and survival supplies to their encampments. These service providers include, but are not limited to, Berkeley Outreach Coalition, Copwatch, Consider the Homeless, Lifelong Medical Homeless Outreach team, Berkeley Free Clinic, Berkeley Suitcase Clinic, East Bay Angels, Berkeley Food Network, Berkeley NEED, Homeless Action Center, and a host of others.

36.    When encampments are evicted, without the people living in them having an alternative and accessible place to shelter, WDWG BERKELEY and other organizations have difficulties maintaining contact with them. The people in the encampments are at significant risk of harm including the risk of losing the supportive services they rely on for their survival.

37.    WDWG BERKELEY members engage with city, state, and local leaders and law enforcement, on behalf of encampment residents, making sure that encampments remain in place until affordable accessible housing is provided.

38.    WDWG BERKELEY has partnered with CALTRANS to clean all three subject encampments, without moving residents, for over a year. WDWG BERKELEY has rented a front loader and cleared the trash and placed the trash in areas designated by CALTRANS for pick up. WDWG BERKELEY has arranged for CALTRANS to send crews to pick up the trash and haul it away once WDWG BERKELEY has collected and moved it to designated areas. Residents of these encampments have not had to move the structures in which they live during these WDWG BERKELEY/CALTRANS cleanups. These cleanups have been regularly scheduled for over a year.

**ASHBY SHELLMOUND ENCAMPMENT**

39.    On or about May 25, 2021, representatives from CALTRANS sent an email to Ian Rogers, President of WDWG BERKELEY, stating that it intended to close the encampment at Ashby Shellmound.

40.    The Ashby Shellmound encampment had been in existence for approximately

three years.

41.     From approximately June 5, 2021 to June 8, 2021, Mr. Rogers emailed CALTRANS notifying it that there were at least nine individuals at the encampment who were disabled and in need of accommodations.

42.     On June 8, 2021, at around 10:15 a.m., CALTRANS posted "No Trespassing" notices at the Ashby Shellmound encampment notifying residents that they needed to remove themselves and their belongings by 8:00 a.m. on June 10, 2021. The notices stated that "all persons on the site at that time will be required to leave." The notices stated that "[a]ll property that is collected will be discarded if not claimed within 60 days of the date of the cleaning." The notices did not specifically state that personal property would be stored in a manner that homeless residents could retrieve them afterwards.

43.     The notices also directed residents to contact a number for information about items collected. The number was a private residential telephone number and not the number to CALTRANS or its representatives.

44.     As a result, WDWG BERKELEY and the residents did not know how to retrieve any belongings that CALTRANS took and stored during the clearing of the encampment.

45.     The residents of Ashby Shellmound encampment had nowhere to go where they could legally shelter and nowhere to move their belongings.

46.     Many of the residents of the Ashby Shellmound encampment had mental and physical disabilities and were qualified persons with a disability under the terms of the ADA and within the meaning of 42 U.S.C. § 12102; 42 U.S.C. § 12131, 28 C.F.R. § 35.104 and Cal. Gov't Code §12926. CALTRANS was on notice that many of the residents of the encampment had physical and mental disabilities.

47.     The actions of CALTRANS in posting notices of eviction from the Ashby Shellmound campsite when people had no place to go, caused encampment residents anxiety and exacerbated the mental health disabilities of residents with disabilities.

48.     Residents of the encampment relied on medical services, harm reduction supplies, legal services, survival supplies, and food provided at the encampment by service organizations

including WDWG BERKELEY.  They reported to WDWG BERKELEY that they feared that if they were evicted, they would be cut off from the services on which they relied.

49.     Prior to CALTRANS posting notices of eviction on June 8, 2021, WDWG BERKELEY had been working with the County of Alameda, the City of Berkeley, and Lifelong Medical to find accessible shelter for people at the Ashby Shellmound encampment. These efforts were known to CALTRANS. Despite this, CALTRANS knowingly sought to evict the encampment residents including those with disabilities. CALTRANS knew or should have known that conducting an eviction while these efforts were ongoing would disrupt and imperil the ability of WDWG BERKELEY and its outreach partners to find suitable accessible transitional and permanent shelter for the inhabitants.

50.     After a successful temporary restraining order allowed sufficient time to find accessible alternative shelter for most of the residents at Ashby Shellmound, residents from other encampments closed by CALTRANS during the effect of the temporary restraining order moved to Ashby Shellmound. The encampment is now split into an east side and a west side.

51.     The east side of the Ashby Shellmound encampment has porta-potties, handwashing stations, potable water for drinking, and a common donation site where community members will deliver food and basic necessities. It is safely accessible from city streets and well-served by organizations such as Berkeley Outreach Coalition, Copwatch, Consider the Homeless, Lifelong Medical Homeless Outreach team, Berkeley Free Clinic, Berkeley Suitcase Clinic, East Bay Angels, Berkeley Food Network, Berkeley NEED, Homeless Action Center, and a host of others.

52.     The west side of Ashby Shellmound is more remote and more dangerous to access. As a result, there are minimal services provided there, with very few donations, no porta-potties, no handwashing stations, and no potable water tank. The west side felt to plaintiffs like the only place to go, because Downstairs and Seabreeze were closed and CALTRANS had posted notice on the east side of Ashby Shellmound, all of which were safer and more accessible encampments than the west side of Ashby Shellmound.

**DOWNSTAIRS ENCAMPMENT**

53.     On July 30, 2021, CALTRANS posted "No Trespassing" notices at the Downstairs encampment stating that the operation to clear the encampment would take place on August 9 and 10, 2021.

54.     Residents of this encampment including plaintiffs Ms. TEAGUE, Mr. CODDINGTON, Mr. JAMES, and Mr. MEYERS have relied on WDWG BERKELEY and other organizations for services and support and for food, tents, and supplies. Many of the residents of this encampment have mental and physical disabilities.

55.      WDWG BERKELEY has partnered with CALTRANS to clean and remove trash from this encampment.

56.     On August 9, 2021, CALTRANS conducted its operation clearing the Downstairs encampment and evicting its inhabitants before all of them had a legal and accessible, alternative place where they could shelter. WDWG BERKELEY, the County of Alameda, Lifelong Medical and other service organizations had been working with the inhabitants of this encampment to find them accessible transitional and/or permanent shelter. The eviction before people were placed in alternative and accessible shelter severed the connections WDWG BERKELEY had established with the inhabitants of this encampment making it harder to contact them and fulfill its mission of meeting their needs in helping them survive.

57.     Plaintiffs SARAH TEAGUE and her partner, KEVIN CODDINGTON lived downstairs for approximately three to four years so they had nowhere to go when they were evicted from the Downstairs encampment. A friend with a car helped them move all their belongings upstairs to the Seabreeze encampment on the day of the CALTRANS eviction. Ms. TEAGUE was not offered a hotel room or a space at the Grayson shelter while living downstairs. She moved upstairs so that she could still have access to services and resources.

58.     Plaintiff KEVIN CODDINGTON was offered a space at the Grayson shelter in Berkeley, but he declined the offer because they would not accept his large dog "Cubit" that is a part of his family. Mr. CODDINGTON was not offered a hotel room. Mr. CODDINGTON is on the permanent supportive housing list but he has not heard from his case worker and he does not know who is representing him.

59.     Plaintiff JONATHAN JAMES, despite working in San Francisco delivering flowers for Garden Party, had no place to go when CALTRANS posted the notice of eviction. While living Downstairs, no one spoke to him about housing or offered him a spot at a shelter or a hotel room. Mr. James moved upstairs to the Seabreeze encampment when CALTRANS evicted everyone from the site. He was not offered alternative shelter or housing.

60.     Plaintiff ALEJANDRO MEYERS, lived Downstairs for approximately four and a half years prior to moving upstairs to the Seabreeze encampment. The only offer of shelter that he received while living Downstairs occurred a couple of years ago. A worker told him he could go to the STAIR Center in Berkeley. The STAIR Center is not accessible to Mr. MEYERS because he cannot live in a shelter due to the extreme anxiety that it causes him from the time he spent incarcerated. His severe anxiety prohibits him from going into a places where he is not free to come and go and where he cannot have visitors. Additionally, he does not feel safe in shelters so he doesn't sleep even when he is tired. Sleeping next to strangers triggers his anxiety. Mr. MEYERS moved upstairs to the Seabreeze encampment after his tent caught on fire.

**SEABREEZE ENCAMPMENT**

61.     On August 6, 2021, CALTRANS posted "No Trespassing" notices at the Seabreeze encampment. The notices stated that CALTRANS would remove the encampment beginning on August 18, 2021.

62.     Residents of this encampment relied on WDWG BERKELEY and other organizations for services and support and for food, tents, and supplies. Many of the residents of this encampment have mental and physical disabilities.

63.     WDWG BERKELEY, the County of Alameda, Lifelong Medical, and other service organizations had been working with the inhabitants of this encampment to find them accessible transitional and/or permanent shelter. These efforts were known to CALTRANS and were ongoing when it posted eviction notices on August 6, 2021.

64.     On August 18, 2021, CALTRANS began clearing the Seabreeze encampment and evicting its inhabitants. It did so, despite the fact that it knew or should have known that conducting an eviction while these efforts were ongoing would disrupt and imperil the ability of

1   its outreach partners to find suitable accessible transitional and permanent shelter for the

2   inhabitants.

3       65.    When they were evicted, life partners, SARAH TEAGUE and KEVIN

4   CODDINGTON, moved all of their belongings on bike with carts to Ashby Shellmound West

5   because they had nowhere else to go. Ms. TEAGUE was under the impression that the east side

6   of the encampment was going to be shut down by CALTRANS so she and her partner moved to

7   the west side.

8       66.    Ms. TEAGUE's depression gets severe when she is evicted. Her depression is

9   particularly crippling when she moves to a new encampment. Starting over is particularly hard

10  and she feels immobilized. Ms. TEAGUE's depression is particularly severe now because a few

11  days after she moved to the Ashby Shellmound West her dog got hit by a car and died. The

12  eviction from Downstairs was stressful and her dog's behavior became erratic. He chewed

13  through his leash and ran into traffic. Each eviction amplified the effects of her disabilities and

14  caused her harm.

15      67.    Mr. CODDINGTON has no where he can legally shelter if he is evicted from Ashby

16  Shellmound West. Due to fear and concern that he and his partner would lose all their

17  belongings to the Berkeley police, they moved everything they owned on bicycles to Ashby

18  Shellmound West. That location is easier to get to on a bike than Ashby East. Mr.

19  CODDINGTON and Ms. TEAGUE, could not move back to Seabreeze encampment because

20  CALTRANS was closing that camp down around the same time they were evicted from Aquatic

21  Park.

22      68.    At Ashby/Shellmound West, Mr. CODDINGTON and his partner do not have

23  access to water, porta potties, food or supplies. The lack of porta potties forces him and his

24  partner to carry their waste out of the camp on their bikes because they are fearful of creating an

25  open cesspool of sewage. Mr. CODDINGTON is overwhelmed with exhaustion, depression and

26  hypervigilance. His dog was killed the day after his arrival at Ashby Shellmound West because it

27  chewed through his leash and ran into oncoming traffic. Animal control would not pick up the

28  dog's body so Mr. CODDINGTON had to call his friend to take his dead dog to the shelter. As a

1    homeless and disabled individual, he is traumatized by all of the recent evictions and moving.

2    He is always afraid when he sees CALTRANS trucks coming toward camp. The death of his dog

3    and the recent evictions triggered his PTSD, grief, and depression.

4            69.    Plaintiff ALEJANDRO MEYERS and his partner SHAWNA GARCIA, lived

5    together at the Seabreeze. When CALTRANS posted the eviction notice at the Seabreeze they

6    moved to Aquatic Park. When Berkeley police evicted them from Aquatic Park, they moved back

7    to the Seabreeze. The next day under threat from the California Highway Patrol and CALTRANS

8    they moved to Ashby/Shellmound West. While living at the Seabreeze Mr. MEYERS was not

9    offered accessible housing or a place to shelter prior to the CALTRANS eviction. Mr. MEYERS

10   was told by encampment residents that, at the Roadway Inn, he could not have a key to his

11   room and that visitors were not allowed. Mr. MEYERS severe anxiety prohibits him from going

12   to a place where he cannot come and go freely.

13           70.    Mr. MEYERS did not have enough time to move all of their belongings on August

14   18, 2021 when CALTRANS and the California Highway Patrol showed up to evict everyone from

15   the Seabreeze. Since they were threatened with eviction the night before at the micro-

16   encampment, Mr. MEYERS and his partner moved back to the Seabreeze. The next morning,

17   they were evicted again. Mr. MEYERS had to move all their belongings using a bike and a bike

18   trailer. He lost his wallet, his ID and his birth certificate. He injured his back while moving their

19   belongings to Ashby Shellmound West. Mr. MEYERS is in constant pain and has to spend most

20   of his time lying down. He has not been able to go to the emergency room because he is afraid if

21   he leaves his new encampment someone will steal what is left of his belongings.

22           71.    Plaintiff SHAWNA GARCIA became homeless because she was a domestic

23   violence victim and she was trying to get away from abusive men. Ms. GARCIA lived at the

24   Seabreeze encampment for approximately two years. A couple of weeks before the eviction from

25   the Seabreeze she was offered a room at the Roadway Inn. Ms. Garcia has three dogs which are

26   her emotional support animals. She does not believe she would be able to have them in the

27   room at the Roadway Inn, which she would share with Mr. MEYERS. If she were allowed to

28   have them, she would need to be able to leave her room after 11 p.m., if they needed to go

outside and relieve themselves. Another reason why she cannot go into the Roadway Inn, is that an ex-partner of hers is living there. She has had violent confrontations with him. He has broken her ribs and tried to steal her dog.

72. Ms. GARCIA and Mr. MEYERS moved from the Seabreeze encampment on around August 16, 2021 in anticipation of the pending eviction. On August 17, 2021, they were evicted from their new encampment at Aquatic Park. On August 18, 2021, they were evicted from the Seabreeze encampment. Having moved back to the Seabreeze the day before, Ms. GARCIA was sleeping at the Seabreeze when the California Highway patrol yelled for her to get out and leave because they were bringing a bulldozer in. She did not have time to collect her belongings and she lost a lot of her personal items like a punching bag, leather jacks, leather boots, all of her underwear, her bed, her dog's beds, a library of books, and two leather couches. Her entire home was bulldozed in front of her. She and her partner moved what was left of their belongings down the road to a patch of land that stands between Frontage Road and the freeway. During the Seabreeze eviction, she was fighting an anxiety attack. She could barely breathe or move. She has been hospitalized for anxiety. Loud male voices, like that of the California Highway Patrol yelling at her to move, can trigger her anxiety due to her previous abuse.

73. Plaintiff JOSE MORFIN has a knee injury that affects his daily activities, and he is a current resident of the Ashby Shellmound encampment. Mr. MORFIN has been homeless for five years. When he was kicked out of the house by his mother, he moved to the Gilman Encampment where he was not offered housing or directed to a place where he could legally stay. When CALTRANS evicted residents from the Gilman encampment, Mr. MORFIN moved near the Costco in Richmond, CA. He returned to Berkeley to live near a friend, plaintiff TERRY LEE WALKER, who lived at the Seabreeze encampment. Mr. MORFIN was not offered housing or a legal place to stay while living at the Seabreeze encampment. CALTRANS posted a notice to evict and close the Seabreeze encampment, so Mr. MORFIN moved to Aquatic Park with a few of his neighbors from the Seabreeze. He and the other residents put up tents and the City of Berkeley police told the residents that they had to move. Mr. MORFIN moved to Ashby

Shellmound because he had nowhere else to go.

74.    Mr. MORFIN wants to live inside but he does not have a phone or income. He has not been offered housing or a place to go at Aquatic Park or while living at the Ashby Shellmound encampment. Currently, he has access to food, water, and donations at the Ashby Shellmound encampment. He has nowhere to go if evicted from the Ashby Shellmound encampment.

75.    Plaintiff RONNIE BROOKS spent many years of his life incarcerated. He cannot go into a shelter where his movement would be restricted, he cannot come and go freely and where he would not have control over his surroundings. Mr. Brooks has lived in approximately six encampments spanning his six years of homelessness. Five of those encampments were on CALTRANS property. He has not been offered housing or directed to a legal place where he could go while living at each encampment or at the time of eviction. He is a former resident of the Gilman and Seabreeze encampments. He now lives at Ashby Shellmound West.

76.    Plaintiff JASON MILLER spent time in prison and has PTSD. He cannot go in a shelter because he knows it would trigger his PTSD. Mr. Miller has been homeless for seven years. He lived at the Seabreeze for approximately two years before he was recently evicted. He lived at Gilman encampment but he was evicted when CALTRANS posted notice, cleared the camp, and put up a fence. Mr. Miller has not been offered housing, a hotel, or a legal place where he can reside.

77.    Plaintiff JONATHAN JAMES has PTSD from being shot twice. He works, delivering flowers for Garden Party, in San Francisco. Mr. James lived Downstairs until he was evicted by CALTRANS. No one offered Mr. James housing or spoke to him about a place where he could live while living Downstairs. When he moved to the Seabreeze encampment because he had nowhere else to go, he was offered a hotel room by Lifelong Medical but when they came back to visit him at the encampment, he was at work. He has not been offered any other housing options. When CALTRANS evicted him from the Seabreeze, he moved to Ashby Shellmound West. Mr. James would have moved to the eastside of Ashby Shellmound but he knew Caltrans was closing down that encampment and he did not want to move again. He visits Ashby Shellmound east to access drinking water, food, handwashing stations, and the porta potties. He

1   currently does not have access to food or water donations or services like he did when he lived

2   Downstairs and at the Seabreeze because his current location is difficult to access.

3       78.     Mr. JAMES has not seen any of the medical providers that visited Downstairs and

4   at the Seabreeze while living at his current location. Mr. JAMES cannot go into a shelter

5   because of his PTSD. He cannot live with a lot of people that he does not know. He experiences

6   anxiety and is hypervigilant around strangers. His PTSD would prohibit him from relaxing in a

7   shelter setting. Currently, he is cut off from services and he has nowhere to go if forced to move

8   from his current location.

9       79.     Plaintiff TERRY LEE WALKER has adjustment disorder, severe grief, and

10  depression. The threat of eviction triggers all of Mr. Walker's health disorders. He is unable to

11  find gainful employment because of his disabilities. Mr. Walker has been homeless for twenty-

12  nine years, moving away from home at sixteen because his mother was an alcoholic. He lived at

13  the Gilman encampment until it was closed and he was evicted by CALTRANS. He also lived in

14  an RV at Wood Street, an encampment in Oakland that is also located on CALTRANS property.

15  Mr. Walker moved to the Seabreeze encampment after his RV was set on fire at Wood Street. At

16  the Seabreeze, he can access vital necessities such as food, water, hygiene products, medical

17  care, tents, clothes, and sleeping bags that are donated by organizations like WDWG Berkeley

18  and volunteers.

19      80.     Approximately one month before he was evicted from the Seabreeze encampment,

20  Mr. Walker was approached by City of Berkeley outreach workers who asked him if he wanted

21  to go into the Horizon shelter on Grayson Street. He accepted the offer, but when he was

22  directed to come to the shelter to be admitted, they did not have his paperwork. The shelter staff

23  told Mr. Walker that he had to come back. Riding his bicycle and carrying all of his belongings,

24  he rode back to the Seabreeze encampment feeling overwhelming despair about being turned

25  away. When he returned to his campsite most of his belongings had been stolen. He was

26  depressed and felt hopeless. Without being offered any other place to live, CALTRANS posted

27  eviction notices and closed the Seabreeze encampment. Mr. Walker packed up his belongings

28  on his bike and moved to the Ashby Shellmound encampment.

81.     Plaintiff KINNDRA MARTIN has lived at Ashby Shellmound west for approximately seven months. She lived at the Gilman encampment until it was closed by CALTRANS. She also lived at the Seabreeze encampment for about a year but left due to a disagreement with another resident. She has not been visited by any outreach workers nor has she been offered accessible housing or a hotel.

82.     Ms. MARTIN suffers from bipolar disorder and depression. Her disabilities prevent her from going into a congregate shelter.  She is unable to work and does not receive income. She does not have access to food, water and other supplies that were available at the Seabreeze encampment. Her disability causes her to spend hours just looking at her shoes.

83.     Plaintiff MARIAH JACKSON suffers from bipolar disorder and lived at the Seabreeze encampment.  She went into the Horizon shelter on Grayson Street but found she could not obey the rules because of her mental disability. She sometimes has to be alone when she is experiencing a bipolar episode. She lost her space at Grayson because she was gone for more than three days which is a violation of the rules. She doesn't know whether she can go back and is unsure if her behavior will allow her to be in that kind of setting. Ms. Jackson is worried that her bipolar disorder would prevent her from following the rules at Grayson because she cannot always control her emotions, and if she cannot get along with people and is disruptive, she understands that she will have to leave.  When she is provoked like when she is being evicted from an encampment, concentrating on tasks becomes challenging. She loses her focus, and her thinking and planning is very disorganized. These behaviors make it hard to navigate evictions. She is also worried because she is not vaccinated against COVID-19.

84.     When CALTRANS closed the Seabreeze encampment, Ms. Jackson moved to Ashby Shellmound west to live with her boyfriend. She knows that she always has a somewhere to come home to even if she has to leave for a few days. She was never offered a motel while living at the Seabreeze. Without resources at Ashby West, Ms. Jackson crosses the freeway to get to the east side of Ashby Shellmound. At that encampment she has the ability to wash her hands, access drinking water and food like vegetables and potatoes or use the porta potty.

85.     People with disabilities who were living at the Downstairs and Seabreeze

1  encampments, and who were evicted by CALTRANS, before they could access affordable

2  accessible shelter, have been placed in harm's way. One disabled elderly woman now sleeps,

3  without shelter or walls, on top of a pile of mattresses alone under a freeway. Other disabled

4  residents have moved to locations that can only be accessed by crossing lanes of high-speed

5  traffic.

6      86.   CALTRANS' continuing practice of evicting encampments before people have the

7  ability to secure, accessible, legal, and safe place to shelter is likely to put people who are

8  evicted, and particularly people with disabilities at risk to their health and safety. Cut off from

9  the support systems they have in the encampment they are likely to be unable to take care of

10  their basic bodily needs for food and hygiene. They are likely to be unable to erect a shelter to

11  protect themselves from the weather and to afford them privacy. Alone, they are likely to be

12  victims of assault and robbery and other forms of violence. Separated from their support

13  systems, they are likely to have their mental disabilities exacerbated by anxiety and depression

14  and re-traumatization. Finally, they are at greater risk of catching COVID, even if they have

15  been vaccinated.

16      87.   On information and belief, defendant EL-TAWANSY approved each of these

17  evictions. She knew or should have known about the disabilities of many of the residents and

18  the time needed to provide them with meaningful, accessible offers of shelter.

19      88.   By proceeding with its plans to evict inhabitants of encampments at Ashby

20  Shellmound and by carrying out the evictions of Downstairs and Seabreeze, while WDWG

21  BERKELEY is endeavoring to find shelter and meet the survival needs of inhabitants of those

22  encampments, CALTRANS has frustrated the mission of WDWG BERKELEY to assist people

23  experiencing homelessness with meeting their basic survival needs and transitioning into

24  stable, legal, accessible housing.

25      89.   WDWG BERKELEY has not been able to continue its work of cleaning and

26  removing trash from encampments. It has had difficulty maintaining contact and continuing to

27  provide assistance to residents of encampments who have been forced to leave before they have

28  a place to go.

90.     Because of the threat of eviction of residents at Ashby Shellmound and the actual eviction at Seabreeze and the Downstairs encampment while efforts are underway to find the inhabitants of those encampments, WDWG BERKELEY had to divert resources into purchasing tents and other equipment that people needed when they were forced to leave their established encampments.

91.    Among other expenses, WDWG has spent over $10,000 to purchase tents and a generator in order to establish an encampment for people evicted from Seabreeze and Downstairs, who have no place to go.

92.    As a result of CALTRANS' continuing practice of evicting people from encampments before they have a place to go, WDWG BERKELEY has had to expend resources that it would otherwise spend to support encampments, tracking former residents down, resupplying them with tents and other necessities of life, and assisting them to reestablish contacts with service providers, including those who assist in finding housing.

93.    CALTRANS policies and practices do not accommodate people with disabilities who are displaced when the encampments in which they reside are closed. WDWG BERKELEY is likely to continue to have its mission frustrated and to have to expend resources to meet the needs of people who are evicted from encampments on CALTRANS property, before they have a place to go.

94.    CALTRANS has a program and plans for addressing encampments on CALTRANS property, engages in activities, and expends resources in dealing with encampments and the people inhabiting them. Those services, programs, and/or activities do not provide accommodations for people with disabilities.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**State-Created Danger in Violation of Due Process Guarantee Under the U.S. Constitution**
(against defendants OMISHAKIN and EL-TAWANSY)
(42 U.S.C. § 1983)

95.    Plaintiff reincorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

96.     Under the Fourteenth Amendment to the U.S. Constitution, no state can "deprive any person of life, liberty or property without due process of law." This federal constitutional provision confers upon plaintiffs a right to be free from a deprivation of their due process by Defendants.

97.     Under 42 U.S.C. Section 1983, "[e]very person who, under color of any statute, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law..."

98.     As part of this right, defendants are prohibited from affirmatively placing the inhabitants of encampments on CALTRANS property in known and obvious danger under an objective deliberate indifference standard.

99.     By noticing operations to clear encampments and clearing encampments on CALTRANS right-of-way without allowing time for people living in those encampments to find alternative accessible shelter, defendants have placed those people, and particularly those with disabilities at risk to their health and safety. Defendants have affirmatively placed and continue to place people in those encampments in known and obvious danger. Defendants have been deliberately indifferent to the danger they have created. As a result, WDWG BERKELEY has had a divert resources to assisting people in those encampments and has had its mission frustrated.

100.     Accordingly, defendants have subjected plaintiff to state-created danger in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983.

**SECOND CLAIM FOR RELIEF**
**State-Created Danger in Violation of Due Process Guarantees Under the California Constitution**
(against all defendants)
(Cal. Const. Art. I, §7)

101.     Plaintiff reincorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

102.     Under Article I, Section 7 of the California Constitution "A person may not be

deprived of life, liberty or property without due process of law." This state constitutional provision confers upon plaintiffs a right to be free from a deprivation of their due process rights by defendants.

103.    As part of this right, defendants are prohibited from affirmatively placing persons in known or obvious danger under and objective and deliberate indifference standard.

104.    By noticing operations to clear encampments and clearing encampments on CALTRANS right-of-way without allowing time for people living in those encampments to find alternative accessible shelter, defendants have placed those people, and particularly those with disabilities at risk to their health and safety. Defendants have affirmatively placed and continue to place people in those encampments in known and obvious danger. Defendants have been deliberately indifferent to the danger they have created. As a result, WDWG BERKELEY has had a divert resources to assisting people in those encampments and has had its mission frustrated.

### THIRD CLAIM FOR RELIEF
### Violation of the Title II of the Americans with Disabilities Act of 1990
(against CALTRANS)
(42 U.S.C. § 12132)

105.    Plaintiff reincorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

106.    Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, provides that: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

107.    California incorporates all of these federal protections into state law, such that violations of the ADA are also state law violations and also contains a broad and independent disability civil rights mandate. (Cal. Gov't Code § 11135 et seq.)

108.    The term "disability" includes persons with mental or physical impairments that limit one or more major life activities. Cal. Gov't Code § 12926 (i) (medical condition), 12926 (j) (mental disability), 12926 (l) (physical disability). WDWG BERKELEY's mission is to serve people who are homeless including those who are qualified individuals with disabilities within

the meaning of 42 U.S.C. § 12102; 42 U.S.C. § 12131, 28 C.F.R. § 35.104 and Cal. Gov't Code §12926.

109.    The ADA and associated state laws obligate public entities to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.150.

110.    CALTRANS is a California state agency that has rules, policies, procedures and programs that prescribe how and in what circumstances CALTRANS will clear and close encampments, in what circumstances it will allow them to stay, and how it should work with neighboring jurisdictions and service organizations to provide accessible shelter for people living in the encampments. CALTRANS' rules, policies, procedures, and programs do not accommodate people with disabilities. CALTRANS' refusal to provide people with disabilities the accommodation of additional time to obtain accessible housing results in the denial of the benefits of programs it has established, which is a violation of Title II of the Americans with Disabilities Act. CALTRANS' failure to accommodate persons with disabilities has caused WDWG BERKELEY to divert resources and has frustrated its mission.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Section 504 of the Rehabilitation Act of 1973**
(against CALTRANS)
(29.S.C. § 701)

111.    Plaintiff reincorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

112.    WDWG BERKELEY's mission is to serve people are homeless including those who are qualified individuals with disabilities within the meaning of Section 504 of the Rehabilitation Act of 1973.

113.    Defendants are the recipients of federal funds sufficient to invoke the coverage of the Rehab Act.

114.    Solely by reason of their disability, the individuals who WDWG BERKELEY serves have, and continue to be, excluded from participation in, denied the benefits of, and subjected to discrimination in his attempts to receive, full and equal access to the services, programs, and/or activities offered by defendants in violation of the Rehabilitation Act.

**PRAYER FOR RELIEF**

115.   WHEREFORE, plaintiffs request that this Court grant them relief as follows:

    (a)   Injunctive relief;

    (b)   Declaratory relief;

    (c)   Damages against CALTRANS for violation of the ADA and Rehab Act and against EL-TAWANSY for violation of constitutional rights;

    (d)   Nominal damages;

    (e)   Reasonable attorney's fees and costs to plaintiffs' counsel;

    (f)   That the Court retain jurisdiction and exercise oversight as to defendants' compliance with its Orders; and

    (g)   Any further relief that this Court deems appropriate.

**DEMAND FOR TRIAL BY JURY**

116.   Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: August 30, 2021        SIEGEL, YEE, BRUNNER & MEHTA

By _*/s/ EmilyRose Johns*_____
    EmilyRose Johns

Attorneys for Plaintiffs
WHERE DO WE GO BERKELEY;
RONNIE BROOKS; JASON MILLER;
KINNDRA MARTIN; KEVIN
CODDINGTON; JONATHAN JAMES;
MARIAH JACKSON; SARAH TEAGUE;
TERRY LEE WALKER; JOSE MORFIN;
ALEJANDO MEYERS; and SHAWNA
GARCIA;