UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHERE DO WE GO BERKELEY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF TRANSPORTATION (CALTRANS), et al.,<br><br>Defendants. | Case No. 21-cv-04435-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Docket No. 78 |

Plaintiffs are Where Do We Go Berkeley ("WDWG") and eleven individual plaintiffs. They have filed suit against Defendants the California Department of Transportation ("Caltrans") and two Caltrans employees. According to Plaintiffs, Defendants are violating Plaintiffs' due process rights (federal and state), as well as their rights under the Americans with Disabilities Act/Rehabilitation Act, by trying to close certain homeless encampments located near the I-80 at the Berkeley-Emeryville border. On August 26, 2021, the Court issued a temporary restraining order enjoining Defendants from evicting the eleven individual plaintiffs from the encampments. *See* Docket No. 51 (minutes).[1] Currently pending before the Court is Plaintiffs' motion for a preliminary injunction. Having considered the parties' briefs and accompanying submissions, as

---

[1] The suit was initially brought by WDWG and six individual plaintiffs. On June 11, 2021, the Court issued a temporary restraining order to protect them from being evicted from the encampment at issue. *See* Docket No. 20 (order). It appears that all of the original six individual plaintiffs – as well as most, if not all, other campers located at the encampment – were able to find alternative housing with the assistance of WDWG, other local organizations, Caltrans, and/or local jurisdictions. The complaint was subsequently amended to include the present eleven individual plaintiffs.

1  well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the
2  motion.

### I.     FACTUAL & PROCEDURAL BACKGROUND

The area where the homeless encampments at issue are located is depicted in the image below provided by Defendants.



*See* Bucko Decl., Ex. A.  While the "red circles" above may not be the exact location of specific camps (as it appears there is some fluidity of movement in the area), the parties generally agree that the area above roughly consists of three parts: (1) the part farthest to the east close to Shellmound ("Ashby/Shellmound"); (2) the middle portion which is triangular in shape, located east of the I-80 ("Ashby East"); and (3) the part farthest to the west, located west of the I-80 ("Ashby West").

There are approximately twenty-seven people who live in these three parts.  The eleven individual plaintiffs live either at Ashby/Shellmound or Ashby West; none lives at Ashby East.  The eleven individual plaintiffs have submitted declarations stating that they have mental and/or physical disabilities.  Most claim mental disabilities.  Some state that they have been diagnosed

1  with specific mental impairments.

2      The eleven individual plaintiffs previously lived at encampments to the north, one of
3  which was known as Seabreeze and the other as Downstairs. These encampments were roughly
4  located near the Seabreeze Market & Deli. Below is an image that shows where Seabreeze and
5  Downstairs were located with reference to the encampments at issue in the instant case.



21  Caltrans closed the Seabreeze and Downstairs encampments in August 2021, which led to the
22  migration of the eleven individual plaintiffs to Ashby/Shellmound and Ashby West.

23      A construction site is located in the area where the encampments at issue are (specifically,
24  at 6701 Shellmound). *See* 2d Clarke Decl. ¶ 3. The City of Emeryville approved the construction
25  project back in March 2016. In March 2021, the owner of the real proper leased a portion of
26  Caltrans property so that work on the project could be done. Below is a picture of the construction
27  site and the Caltrans right of way ("ROW"). *See* 2d Clarke Decl. ¶¶ 4, 19; *see also* 1st Clarke
28  Decl. ¶ 5.

3



2d Clarke Decl., Ex. A.

A portion of Ashby/Shellmound is located on the Caltrans ROW.



2d Clarke Decl., Ex. A.

## II. DISCUSSION

A. Legal Standard

Under Federal Rule of Civil Procedure 65, the Court has the authority to issue preliminary injunctive relief. A preliminary injunction may issue if a plaintiff establishes: (1) that it is likely to succeed on the merits; (2) that it will likely suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). Following the Supreme Court's decision in *Winter*, the Ninth Circuit has clarified that its "sliding scale" approach to preliminary injunctive relief is still viable. That is, if the plaintiff can demonstrate the risk of irreparable injury, under the sliding scale test, the strength of the plaintiff's showing on the merits necessary to secure a preliminary injunction varies with the degree to which the balance of hardship tips in its favor. In other words, preliminary injunctive relief "'is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

B. Irreparable Harm, Balance of Hardships, and Public Interest

The Court considers first the irreparable harm that Plaintiffs would suffer in the absence of a preliminary injunction, the balance of hardships, and the public interest.

Plaintiffs assert that the eleven individual plaintiffs would suffer irreparable harm in the absence of a preliminary injunction because, if the encampments were to be closed, then they would have nowhere else to go. The Seabreeze and Downstairs encampments have been closed, and the City of Berkeley has made clear that it will not allow an encampment in the Aquatic Park area.

Defendants concede no other shelters or hotels are currently available but contend that there is one alternative for the eleven individual plaintiffs – specifically, Berkeley has made available spots at a congregate shelter known as Horizon (located on or near Grayson Street). Horizon is essentially a warehouse-type space where people live in tents indoors. The tents are

separated by a few feet. The tents are generally not tall enough to stand in. There is a large space for general housing, but "there is a separate area for individuals who may need quieter space [or] who have difficulty being around large numbers of people. This quieter space can accommodate fifteen (15) people." Rafferty Decl. ¶ 5. This separate space is similar to the main space except it is less dense. Most of the eleven individual plaintiffs, however, have explained in their declarations why Horizon is not a viable alternative: they have mental impairments which, *e.g.*, make living in big groups in close proximity to others or living near strangers extremely difficult. Although the Court cannot at this juncture definitively conclude that all eleven individual plaintiffs' have mental impairments that would preclude staying at Horizon – particularly on a temporary basis – a number of them have articulated what on their face appear to be valid concerns. For example:

- Ms. Garcia testifies that she has been homeless for about twelve years. *See* 1st Garcia Decl. ¶ 1. She has been diagnosed with clinical depression and anxiety order, and, in the past, she has been hospitalized for her anxiety. *See* 2d Garcia Decl. ¶ 7; 1st Garcia Decl. ¶ 10. Since she was a child, she has never been able to be around big groups of people. *See* 2d Garcia Decl. ¶ 3. In addition, she has suffered abuse from men over the years. *See* 1st Garcia Decl. ¶ 9. *See, e.g.*, 2d Garcia Decl. ¶ 5 (testifying that the father of her children tried to set her on fire).
- Mr. Myers testifies that he has been homeless for about sixteen years. *See* 1st Myers Decl. ¶ 2. He has been diagnosed with chronic depression, PTSD, and severe anxiety for which he was prescribed medications (but which he stopped taking because of their side effects). *See* 2d Myers Decl. ¶ 6. Before he became homeless, he was in prison where he was strip searched five days a week for years and where he experienced seven different race riots. *See* 2d Myers Decl. ¶¶ 2, 10, 12-13. There was also an incident in which officers strip searched him, hog tied him while he was naked, and left in a holding cell with the lights off. *See* 2d Myers Decl. ¶ 25-26. Because of his experiences, he fears being naked in front of strangers. As a result, he does not use the public mobile showers that are made

1
2
3

available for homeless persons.  When he does take a shower, he leaves his boxer shorts on.  However, he has not taken a shower for six months and instead takes sponge baths.  *See* 2d Myers Decl. ¶¶ 11, 30-31.

- Ms. Teague testifies that she has been homeless "on and off for 15 years."  1st Teague Decl. ¶ 2.  She receives SSI benefits for clinical depression.  *See* 1st Teague Decl. ¶ 10.  She has been evicted from several encampments which has heightened her depression.  *See* 1st Teague Decl. ¶¶ 11, 13.  She also has severe depression now because of the death of her dog, who was hit by a car shortly after she and her partner moved to the area at issue.  *See* 1st Teague Decl. ¶ 14.

- Ms. Jackson does not testify how long she has been homeless.  However, she testifies that she has bipolar disorder and PTSD.  When she spirals, she experiences serious anxiety and has difficulty sleeping.  *See* Jackson Decl. ¶ 5.  She tried to stay at the Horizon shelter but, because of her bipolar disorder, she had to leave and go out on her own for several days.  She lost her spot at the shelter because she was gone for more than three days, which is a violation of the shelter's rules.  *See* Jackson Decl. ¶ 6.  Her bipolar disorder also makes it difficult for her to control her emotions, and the shelter asks persons to leave if they are deemed disruptive.  *See* Jackson Decl. ¶ 7.

These difficulties the individual plaintiffs would have living in the congregate space at Horizon is underscored by Dr. Curiale, a licensed clinical psychologist.  Although Dr. Curiale did not personally interview or examine the individual plaintiffs, she reviewed their declarations, and opined that indoor congregate living would not be appropriate for most of these individuals.

In light of the above, the Court finds that Plaintiffs have sufficiently shown a likelihood of irreparable injury to the individual plaintiffs if the encampments where they are living were to be closed, leaving Horizon as the only alternative.  The hardship to the individual plaintiffs is exacerbated by the public health concerns of disbanding homeless encampments during the COVID-19 pandemic.  The CDC guidance provides: "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.

7

1  Clearing encampments can cause people to disperse throughout the community and break
2  connections with service providers. This increases the potential for infectious disease spread."
3  https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-
4  homelessness.html (last visited 9/24/2021); *see also Sausalito/Marin Cty. Chapter of the Cal.*
5  *Homeless Union v. City of Sausalito*, No. 21-cv-01143-EMC, 2021 U.S. Dist. LEXIS 37806 (N.D.
6  Cal. Mar. 1, 2021) (taking into account CDC guidance in enjoining the city from closing an
7  encampment located at Dunphy Park). The Alameda County Health Care for the Homeless is
8  reporting a significant increase in COVID infections among unsheltered persons in the county. Exhibit
9  A to Plaintiffs' Request for Judicial Notice, at 1-2.

10  Turning to hardship to Defendants and/or the public if preliminary injunctive relief were to
11  be granted, the Court recognizes that there are notable safety risks associated with the
12  encampments at issue. These include the following: risk to driver safety (because the
13  encampments are visual distractions and because trash from the encampments can make its way
14  onto the shoulder and the traveled part of the highway); risk to camper safety (because, to access
15  some parts of the area, campers must cross offramps); electrical issues (because some campers
16  have broken into Caltrans electrical cabinets and boxes to get power, which can trip breakers,
17  overload circuits, and/or otherwise cause electrical faults, which can in turn impact Smart Corridor
18  display signs and the ramp meter system); fire risk (because some campers use open flames and
19  because the encampments make landscaping maintenance more difficult); and environmental
20  issues (because campers generate trash and human waste).

21  Indeed, the encampments at issue have been rated as a "Level 1" 1 site pursuant to the
22  Caltrans Interim Guidance on Encampments (published in June 2021). The record indicates that,
23  in 2020, any encampment for which there were safety concerns was, in essence, designated Level
24  1, *i.e.*, in need of urgent relocation. At the end of 2020, Caltrans implemented a four-level
25  approach – as reflected in the Interim Guidance – because of the COVID-19 pandemic. Level 1 is
26  deemed critical priority, Level 2 high priority, Level 3 moderate priority, and Level 4 low priority.
27  *See* Interim Guidance at 3. Thus, under the Interim Guidance, the encampments at issue present
28  the greatest concern. Because of the substantial risks, allowing the encampments to remain in

place permanently is clearly not viable. Indeed, Plaintiffs have not seriously argued otherwise.

On the other hand, there have been different people living in the encampments over the years, and, as of this date, no serious injuries or harms have occurred. If the eleven individual plaintiffs were afforded only *temporary* relief from eviction, the hardship and risks identified, while extant, would be mitigated by a limited duration.

Moreover, as discussed at the hearing, Defendants are in a position to mitigate the risk associated with the encampments at issue by allowing campers to stay, on a temporary basis, at a different Caltrans property that poses less danger – *i.e.*, at Seabreeze, one of the encampments that Caltrans closed in August 2021. While Caltrans has designated the encampments at issue Level 1 in terms of safety risk – *i.e.*, the highest level which thus made closure critical or urgent – Seabreeze was designated Level 2. Level 2 encampments are also required to be closed; however, there is less of an immediate need for closure compared to Level 1.[2] And notably, Caltrans had been in discussion earlier this year with the City of Berkeley to locate a homeless shelter at Seabreeze. Evidently, the discussions were not successful.[3]

Both in their papers and at the hearing, Defendants strongly objected to allowing an encampment at Seabreeze, asserting that "any order fashioned to compel use of Caltrans property for encampments, or expenditure of Caltrans funds for housing and non-transportation purposes, would exceed the powers given to Caltrans under the California Constitution, as well as state and federal laws."[4] Opp'n at 12. Defendants also argued that Caltrans is only authorized "to lease State property that satisfies various safety conditions to certain specified public entities [and not,

---

[2] As reflected in Plaintiffs' papers, WDWG was willing to manage a temporary encampment at Seabreeze to mitigate safety risks, including limiting the number of campers, providing portable bathrooms, generating electricity, providing fireproof tents, and cleaning up.

[3] At the hearing, the parties strongly disagreed why nothing came of these discussions. Caltrans asserted that the decision not to proceed was Berkeley's; Plaintiffs put the blame on Caltrans.

[4] At the hearing, the Court pointed out that, under Defendants' position, the Court should not even be permitted to issue an order allowing the eleven individual plaintiffs to remain on the encampments at issue as this would also constitute (under their theory) a violation of state and federal law. The Court rejects Defendants' suggestion that it lacks the authority to preserve the status quo – *i.e.*, to enjoin Defendants from closing the encampments even if, ordinarily, they would do so.

*e.g.*, a public interest organization or individuals] for emergency shelter purposes." Opp'n at 14 (emphasis omitted). But the validity of Defendants' position is debatable, particularly if Caltrans were only to allow for an encampment to be at Seabreeze for a temporary, limited period of time. A temporary encampment does not, in effect, transform Caltrans into a housing provider. It would not constitute a "lease" of Caltrans property. Furthermore, Caltrans's Interim Guidance implicitly recognizes that there is no violation of federal or state law where an encampment is simply allowed to remain on a temporary basis so that Caltrans can work with local partners to relocate campers. *See* Interim Guidance at 3. More fundamentally, Caltrans' argument disregards the fact that Plaintiffs have brought federal claims here, and federal law, as a general matter, trumps state law under the Supremacy Clause. A federal court has the power to issue relief based on federal law even if the resulting conduct is inconsistent with state or local law. *See, e.g., Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). As noted at the hearing, if Caltrans were to allow the individual plaintiffs to move to Seabreeze, the Court would lift the preliminary injunction on closure of the current encampment sites.

Accordingly, the Court concludes that Plaintiffs have established a likelihood of irreparable injury without preliminary injunctive relief, and that the balance of hardships tips sharply in their favor – at least at this juncture in the proceedings – with one exception. That exception concerns the part of Ashby/Shellmound that is located on the part of the Caltrans ROW leased for the construction project. Here, the public interest weighs against Plaintiffs' position. The state of California is in strong need of new housing. *See* 2d Clarke Decl. ¶ 31 (testifying that the state "needs 1.8 million new housing units by 2025, but is only producing about 80,000 units on average each year, according to the Department of Housing and Community Development"). The construction project will help meet that need by providing a 7-story, 186-unit residential building, with some of the units even being reserved "for households earning up to 50% of the area median income as affordable housing." 2d Clarke Decl. ¶ 4. Furthermore, moving campers out of only a portion of Ashby/Shellmound – *i.e.*, that part located on the ROW leased for the construction project – will not create an undue hardship on these campers so long as the remainder of Ashby/Shellmound remains open, as well as Ashby West.

C.  Likelihood of Success on the Merits/Serious Questions on the Merits

Because the balance of hardships tips sharply in Plaintiffs' favor (or at least, the eleven individual plaintiffs), they need only show that there are serious questions on the merits in order to obtain preliminary injunctive relief. Plaintiffs have met that lesser standard for their ADA claim, at least to the extent they seek only temporary, limited relief.[5]

Plaintiffs' ADA claim is based on Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). Plaintiffs assert that they have a viable Title II claim because Caltrans has implemented a "program" regarding the removal of homeless encampments (*e.g.*, as reflected in the Interim Guidance) and, under Title II, that program must give reasonable accommodation to disabled persons because they have more difficulty in relocating and/or finding housing and therefore need more time before being evicted.

Plaintiffs' legal theory has support from the Ninth Circuit's recent decision in *LA Alliance for Human Rights v. County of L.A.*, No. 21-55395, 2021 U.S. App. LEXIS 28824 (9th Cir. Sept. 23, 2021), which indicates that what constitutes a service, program, or activity of a public entity under the ADA should not be narrowly construed. *See id.* at *29 (stating that "Skid Row area sidewalks are a service, program, or activity of the City within the meaning of Title II of the ADA"); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (noting that the question "is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity"; "maintaining public sidewalks is a normal function of a city and without a doubt something that the [City] does" and, therefore, "[m]aintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II") (internal quotation marks omitted). Moreover, even if Caltrans cannot be said to have a "program" for purposes of the ADA, the second clause of Title II still provides that a public entity cannot subject a disabled person to discrimination. Although the

---

[5] Because the standard is met for the ADA claim, the Court does not address Plaintiffs' due process (*i.e.*, state-created danger) claim.

11

1    Ninth Circuit has held that Title II prohibits discrimination in a public entity's "outputs" and not
2    its "inputs" (*e.g.*, employment), *see Zimmerman v. Or. DOJ*, 170 F.3d 1169 (9th Cir. 1999), other
3    courts have construed the "subjected to discrimination" clause broadly. *See, e.g.*, *Haberle v.*
4    *Troxell*, 885 F.3d 171, 179-80 (3d Cir. 2018) (noting that, under the "subjected to discrimination"
5    clause, a plaintiff could bring a Title II claim for a police failure to provide reasonable
6    accommodation during an arrest). The Ninth Circuit has not defined with precision the outer
7    limits of the clause. Plaintiffs state a plausible claim that the discrimination clause affords them
8    the right to a reasonable accommodation.

9    The Court acknowledges that Title II of the ADA does have limits, most notably, where an
10   accommodation would fundamentally alter the nature of the public entity's activities. *See, e.g.*,
11   *Rose v. Rhorer*, No. 13-cv-03502-WHO, 2014 U.S. Dist. LEXIS 64550, at *12-13 (N.D. Cal. May
12   9, 2014) (noting that "the plaintiffs have requested automatic shelter extensions, transformation of
13   shelter beds into medical respite beds, and dedicated shelters for people with disabilities" but
14   "[t]hese requests would fundamentally alter San Francisco's emergency adult shelter program,
15   transforming it into long-term housing for a small group of people with disabilities, and are
16   therefore not required by the ADA"). In the instant case, the longer the accommodation is (*i.e.*,
17   giving more time for disabled persons to relocate), the stronger the argument Defendants have that
18   Caltrans's property is being fundamentally altered to that of providing housing, which is outside of
19   its transportation-driven duties. Furthermore, as time progresses and the individual plaintiffs are
20   given more time to find alternative housing, Caltrans's duty of providing reasonable
21   accommodation is increasingly being met. Indeed, at the hearing, counsel for Plaintiffs stated they
22   needed six months to find alternative housing. Still, at least at this juncture, there is a serious
23   contention that this case has not yet reached the stage of fundamental alteration of Caltrans's
24   property and function and that its duty to accommodate still obtains. Therefore, the ADA provides
25   a basis for interim relief to the eleven individual plaintiffs. However, that basis wanes with time,
26   and the balance of hardship shifts in Caltrans's favor over time.

27   ///
28   ///

### III. CONCLUSION

Taking into account all of the above, the Court finds that a preliminary injunction is appropriate for a period of six months. Through March 23, 2022, Defendants and others acting in concert with them are enjoined from evicting the eleven individual plaintiffs who live at the following encampments: (1) Ashby West and/or (2) Ashby/Shellmound, with one exception (see below). In addition, for the same period, Defendants and others acting in concert with them are enjoined from evicting from those encampments (with the same exception below) any persons who already lived in the area as of the time that the operative second amended complaint was filed. Plaintiffs have represented that there are approximately sixteen such individuals (for a total of approximately twenty-seven campers, including the eleven individual plaintiffs).[6] Although these individuals are not named plaintiffs, they appear to live with the named plaintiffs and/or provide support to the named plaintiffs such that excluding them from the protections of the preliminary injunction may be detrimental to the plaintiffs and hinder and complicate enforcement of the injunction. Having the scope of the injunction cover these individuals is also consistent with preservation of the status quo.

The one exception referred to above is that Defendants may evict any of the campers who live on that portion of Ashby/Shellmound located on the California ROW that has been leased for the construction project. These persons should be moved only to the extent that the construction developer needs access to the ROW to build the emergency access road and the surrounding fence. These persons are permitted to stay in the remaining area of Ashby/Shellmound (*i.e.*, the area closest to Shellmound) or they may relocate to Ashby West. The Court expects the parties and the developer to work cooperatively should there be an issue as to whether a person should be moved.

The preliminary injunction above does not preclude Defendants from evicting any camper who lives at Ashby East or from closing Ashby East. Plaintiffs have represented that no

---

[6] At the hearing, Plaintiffs agreed to provide Defendants with a list of the legal names of those twenty-seven campers so that Defendants can ensure that new people will not move into the areas, which would create an obstacle to the eventual closure of the encampments. The parties also indicated at the hearing that they would work cooperatively to monitor the encampments to ensure that new people do not move into the encampments.

individual plaintiff lives there. To the extent any of the sixteen non-plaintiffs live at Ashby East, they are permitted to relocate to Ashby West or the protected portion of Ashby/Shellmound. In closing Ashby East and the Caltrans ROW, Defendants are expected to comply with the procedures for removal established in the *Sanchez* state court case. Defendants shall not post any notice of removal until Monday, September 27, 2021, at 12:00 p.m., at the earliest.

Defendants' request for a bond is denied for the reasons stated on the record.

This order disposes of Docket No. 78.

**IT IS SO ORDERED**.

Dated: September 27, 2021

_____
EDWARD M. CHEN
United States District Judge