1

2

3

4                     UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7   WHERE DO WE GO BERKELEY, et al.,        Case No. 21-cv-04435-EMC

8                  Plaintiffs,

9           v.                              ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
10  CALIFORNIA DEPARTMENT OF                MOTION TO DISMISS
    TRANSPORTATION (CALTRANS), et al.,      Docket No. 90
11
                   Defendants.
12

13

14

15          Plaintiffs are Where Do We Go Berkeley ("WDWG"), a nonprofit organization, and eleven

16  individuals, a number of which are disabled.  They have sued the California Department of

17  Transportation ("Caltrans") and two of its employees, Dina El-Tawansy (the District Four Director

18  of Caltrans) and Toks Omishakin (a Director of Caltrans).  Ms. El-Tawansy is being sued in both

19  her official and individual capacities; Mr. Omishakin is being sued in his official capacity only.[1]

20  Plaintiffs allege that Defendants' attempted closure of homeless encampments along the I-80

21  corridor has violated their federal and state rights.  Plaintiffs bring due process claims for a state-

22  created danger (both federal and state law) as well as claims for a violation of the Americans with

23  Disabilities Act ("ADA") and/or the Rehabilitation Act.  Currently pending before the Court is

24  Defendants' motion to dismiss.

25

26  _____

27  [1] In the operative complaint, Plaintiffs stated that they were suing Mr. Omishakin in both his
    official and individual capacities (as with Ms. El-Tawansy).  However, in their opposition,
    Plaintiffs note that, at this time, they are not "advanc[ing] their claims against [Mr.] Omishakin in
    his individual capacity and seek dismissal without prejudice" – i.e., unless "evidence arise[s] that
28  he had requisite involvement in the violations at issue in this complaint."  Opp'n at 24 n.6.

*United States District Court*
*Northern District of California*

1    Having considered the parties' briefs as well as the oral argument of counsel, the Court

2    hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

3                    I.    <u>FACTUAL & PROCEDURAL BACKGROUND</u>

4    The operative complaint in this case is the second amended complaint ("SAC").  The

5    factual predicate for all of Plaintiffs' claims is largely contained in ¶ 86 of the SAC.  That

6    paragraph states as follows:

> CALTRANS' continuing practice of evicting encampments before
> people have the ability to secure, accessible, legal, and safe place to
> shelter is likely to put people who are evicted, and particularly
> people with disabilities at risk to their health and safety.  Cut off
> from the support systems they have in the encampment they are
> likely to be unable to take care of their basic bodily needs for food
> and hygiene.  They are likely to be unable to erect a shelter to
> protect themselves from the weather and to afford them privacy.
> Alone, they are likely to be victims of assault and robbery and other
> forms of violence.  Separated from their support systems, they are
> likely to have their mental disabilities exacerbated by anxiety and
> depression and re-traumatization.  Finally, they are at greater risk of
> catching COVID, even if they have been vaccinated.

14   SAC ¶ 86.

15   Based on, *inter alia*, ¶ 86, Plaintiffs have asserted the following claims for relief:

16        (1) State-created danger in violation of the Due Process Clause of the U.S. Constitution

17             (against the individual defendants only).

18        (2) State-created danger in violation of the Due Process Clause of the California

19             Constitution (against all Defendants).

20        (3) Violation of Title II of the ADA (against Caltrans only).

21        (4) Violation of the Rehabilitation Act (against Caltrans only).

22   In terms of remedies, Plaintiffs seek injunctive/declaratory relief.  They also seek damages against

23   Caltrans for the ADA/Rehabilitation Act claims and against Ms. El-Tawansy in her individual

24   capacity for the due process claims.  *See* SAC, Prayer for Relief ¶ 115(a)-(c).

25                          II.    <u>DISCUSSION</u>

26   A.    <u>Legal Standard</u>

27        In the pending motion, Defendants move to dismiss for lack of Article III standing and for

28   failure to state a claim for relief.

United States District Court
Northern District of California

1 A motion to dismiss for lack of standing is governed by Federal Rule of Civil Procedure

2 12(b)(1).  *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010)

3 ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are

4 properly raised in a Rule 12(b)(1) motion to dismiss.").

> "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*  The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  "[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.  "In resolving a factual attack on jurisdiction," the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*  The Court "need not presume the truthfulness of the plaintiff's allegations" in deciding a factual attack. Id.

15 *Phillips v. Apple Inc.*, No. 15-CV-04879-LHK, 2016 U.S. Dist. LEXIS 53148, at *8-9 (N.D. Cal.

16 Apr. 19, 2016).  In the instant case, Defendants are making a facial attack only.

17 A motion to dismiss for failure to state a claim is governed by Rule 12(b)(6).  Federal Rule

18 of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim

19 showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to

20 meet this standard may be dismissed pursuant to Rule 12(b)(6).  To overcome a Rule 12(b)(6)

21 motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009),

22 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the

23 complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v.

24 Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the

25 complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

26 party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But

27 "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must

28 contain sufficient allegations of underlying facts to give fair notice and to enable the opposing

1    party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).

2    "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

3    draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

4    U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for

5    more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks

6    omitted).

7    B.    Standing

8          "To have standing under Article III, a plaintiff must have (1) a concrete and particularized

9    injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable

10   judicial decision." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020). In the case at

11   bar, Defendants argue that both the individual plaintiffs and WDWG lack standing to bring suit.

12         1.    Individual Plaintiffs' Standing

13         According to Defendants, the individual plaintiffs lack standing because they have not

14   adequately pled an injury in fact or redressability. Neither argument is persuasive.

15         "A plaintiff threatened with future injury has standing to sue if the threatened injury is

16   certainly impending *or* there is a substantial risk that the harm will occur." *In re Zappos.com,*

17   *Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (internal quotation marks omitted; emphasis added). In

18   the case at bar, the individual plaintiffs have adequately alleged a substantial risk of injury if the

19   homeless encampments at issue (*i.e.*, Ashby Shellmound and the related encampments) are closed.

20   Notably, when the Downstairs and Seabreeze encampments were closed, the individual plaintiffs

21   suffered harm. Some lost connections with services that had been provided at those sites. *See,*

22   *e.g.*, SAC ¶ 58 (alleging that Mr. Coddington "is on the permanent supportive housing list but he

23   has not heard from his case worker and he does not know who is representing him"); SAC ¶ 78

24   (alleging that Mr. James "has not seen any of the medical providers that visited Downstairs and at

25   the Seabreeze while living at his current location"). Some experienced mental distress from being

26   evicted. *See, e.g.*, SAC ¶ 66 (alleging that Ms. Teague's "depression gets severe when she is

27   evicted" and "[s]tarting over is particularly hard and she feels immobilized"); SAC ¶ 72 (alleging

28   that Ms. Garcia had an anxiety attack during the Seabreeze eviction). Some had to relocate to

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    Ashby West where there is no "access to water, porta[ble] potties, food or supplies." SAC ¶ 68;

2    *see also* SAC ¶ 77. Some lost property from the forced move. *See, e.g.*, SAC ¶ 72 (alleging that

3    Ms. Garcia "did not have time to collect her belongings [at Seabreeze] and she lost a lot of her

4    personal items like a punching bag, leather jacks, leather boots, all of her underwear, her bed, her

5    dog's beds, a library of books, and two leather couches"). Given this past experience, it is

6    plausible that the individual plaintiffs would suffer similar harms if Ashby Shellmound and the

7    related encampments were closed. This is particularly true where members of the encampments

8    assert they have disabilities whose effects will be exacerbated if they are evicted from their current

9    location. At the very least, there is a substantial risk that the individual plaintiffs would be severed

10   from services and suffer mental distress from being evicted and having no other place to go.

11            Defendants' redressability argument fares no better. According to Defendants, the

12   individual plaintiffs "are demanding that the Court permit [them] to camp indefinitely on Caltrans

13   property, at least until the people residing there have obtained alternative housing or Caltrans

14   provides alternative places where these people can reside, and that Caltrans must specially

15   accommodate people claiming disabilities." Mot. at 9. Defendants maintain that this would force

16   Caltrans to violate state and federal law. But there are several problems with Defendants'

17   position.

18            First, Defendants have mischaracterized the relief the individual plaintiffs are seeking.

19   They are not asking for permission to remain at the encampments indefinitely – or even semi-

20   permanently, as Defendants claim in their reply. Indeed, at the hearing on the preliminary

21   injunction, Plaintiffs asked for a stay on eviction for a period of six months so that they could find

22   alternative housing.

23            Second, Defendants' position that they would violate state and federal law if they were to

24   give the individual plaintiffs any relief is belied by their own prior actions. As Plaintiffs note in

25   their opposition brief:

26            Caltrans['s] argument is . . . betrayed by the fact that they allowed
              homeless encampments to exist on their property for years without
27            running afoul of such statutes. (SAC ¶¶ 40, 57, 60. 72, 76, 81.)
              Further, [Caltrans's] own interim guidance allows for much of the
28            relief that plaintiffs seek. (SAC ¶ 8.) Finally, in response to the

Governor's executive order, the State Department of Land Management identified Caltrans land that would be suitable for such temporary shelter.  (ECF No. 55, Exs. 1-2.)

Opp'n at 10-11.

Moreover, it is far from clear that giving the individual plaintiffs some time to find a place to go would violate state or federal law.  For example, most of the state laws cited by Defendants in their briefs cover what Caltrans is *authorized* to do but do not address what the agency is *prohibited* from doing.  *See, e.g.*, Cal. Sts. & Hy. Code § 90 ("The department shall have full possession and control of all state highways and all property and rights in property acquired for state highway purposes.  The department is authorized and directed to lay out and construct all state highways between the termini designated by law and on the locations as determined by the commission.").  As for federal law, the authority cited by Defendants does appear to place limits on what Caltrans can do with respect to federally funded projects.  *See, e.g.*, 23 U.S.C. § 116(b) ("It shall be the duty of the State transportation department or other direct recipient to maintain, or cause to be maintained, any project constructed under the provisions of this chapter or constructed under the provisions of prior Acts."); *id.* § 116(d) ("If at any time the Secretary shall find that any project constructed under the provisions of this chapter, or constructed under the provisions of prior Acts, is not being properly maintained, he shall call such fact to the attention of the State transportation department or other direct recipient.  If, within ninety days after receipt of such notice, such project has not been put in proper condition of maintenance, the Secretary shall withhold approval of further projects of all types in the State highway district, municipality, [etc.] until such project shall have been put in proper condition of maintenance.").  However, the consequence of "violating" federal law here would be that Caltrans might not get approval for further projects – and only on a temporary basis (*i.e.*, until the project at issue is put in proper condition).  There does not appear to be any outright federal ban on permitting temporary encampments on Caltrans property.

Accordingly, the Court finds that the individual plaintiffs have adequately alleged both injury in fact as well as redressability.

1

        2.        WDWG's Standing

WDWG has sued on its own behalf as well as on the behalf of those it represents.  Thus,

ordinarily, the Court would consider both direct standing on the part of WDWG (organizational

standing) as well as indirect standing (associational/representational standing).  However, in its

opposition, WDWG focuses on direct standing only and therefore the Court does the same.  To

establish direct standing – *i.e.*, organizational standing – a plaintiff-organization must

> show that the challenged conduct frustrated their organizational
> missions and that they diverted resources to combat that conduct. . .
> . Organizations divert resources when they "alter[] their resource
> allocation to combat the challenged practices," but not when they go
> about their "'business as usual.'"

> Diversion of resources has been found when organizations
> "expended additional resources that they would not otherwise have
> expended, and in ways that they would not have expended them."
> This requirement was satisfied, for example, when an organization
> designed and disseminated literature to redress the effects of the
> challenged discrimination, and when an organization started new
> campaigns targeting discriminatory roommate preference practices.

*Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021).

In the SAC, WDWG alleges that it is a nonprofit organization "made up of homeless and

housing insecure individuals and advocates."  SAC ¶ 17.  Its mission "is to represent, support, and

serve the residents of the encampments along the I-80 corridor on the Caltrans right-of-way in

Berkeley and Emeryville, and other homeless individuals living in the East Bay."  SAC ¶ 1.

According to WDWG, Defendants' actions in the past have frustrated its mission and it has had to

divert resources to combat their conduct – for example, WDWG had to "purchas[e] "tents and

other equipment that people needed when they were forced to leave their established encampments

[at Downstairs and Seabreeze]."  SAC ¶ 90.  In addition, WDWG had to "expend resources that it

would otherwise spend to support encampments, [*i.e.*,] tracking former residents down,

resupplying them with tents and other necessities of life, and assisting them to reestablish contacts

with service providers, including those who assist in finding housing."  SAC ¶ 92.

Given the allegations above, WDWG has sufficiently established organizational standing:

it has alleged a substantial risk that it will suffer similar harm if there is closure of Ashby

Shellmound and the related encampments.  *Cf. Reed v. City of Emeryville*, No. 21-cv-02781-

1    WHO, 2021 U.S. Dist. LEXIS 206500, at *9 (N.D. Cal. Oct. 26, 2021) (concluding that WDWG

2    "has adequately alleged a 'diversion-of-resources' injury: but for the required spending of the

3    resources to put plaintiffs up in hotel rooms, WDWGB would have allocated its resources

4    elsewhere").

5         Defendants challenge whether there are sufficient allegations to support a diversion of

6    resources, arguing, *e.g.*, that WDWG had not explained why Caltrans's closure of the

7    encampments made new tents necessary: "[t]here is no suggestion that [people's] living

8    circumstances (i.e., living in tents) changed – only the location changed," and "[t]here is no

9    allegation that Caltrans seized or destroyed plaintiffs' tents, necessitating their replacement."

10   Reply at 6.  But even if the Court credits this argument made by Defendants, WDWG has

11   explained how some of its resources will be diverted; for instance, because of the closures of

12   Downstairs and Seabreeze, it had to track down former residents of those encampments and help

13   them reestablish contacts with service providers.  There is a substantial risk that the same problem

14   would arise with closure of Ashby Shellmound and the related encampments.

15        Accordingly, the Court finds that both the individual plaintiffs and WDWG have

16   adequately alleged standing.

17   C.    Caltrans and Eleventh Amendment Immunity

18        All of Plaintiffs' claims have been asserted against Caltrans – *i.e.*, state-created danger

19   under federal and state law[2] and violation of the ADA/Rehabilitation Act.  In the motion to

20   dismiss, Caltrans contends that it has Eleventh Amendment immunity with respect to (1) the claim

21   for state-created danger under state law and (2) the ADA claim.[3]

22        Plaintiffs concede that Caltrans has Eleventh Amendment immunity for the claim for state-

23   created danger under state law.  *See* Opp'n at 16 n.4 ("Plaintiffs concede that the Eleventh

24   Amendment precludes the enforcement of state law against state officials."); *see also Pennhurst*

25   _____

26   [2] The federal claim for state-created danger is technically brought against the individual
     defendants, but that includes in their official capacities; thus, effectively, the claim is against

27   Caltrans.

28   [3] Caltrans concedes that it does not have Eleventh Amendment immunity for the Rehabilitation
     Act claim.  *See* Mot. at 16.

United States District Court
Northern District of California

1  *St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against

2  state officials on the basis of state law, whether prospective or retroactive, does not vindicate the

3  supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on

4  state sovereignty than when a federal court instructs state officials on how to conform their

5  conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie

6  the Eleventh Amendment."); *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004)

7  ("'[The plaintiff's] state law claims are barred by the Eleventh Amendment, which precludes the

8  adjudication of pendent state law claims against nonconsenting state defendants in federal

9  courts.").

10  However, for the ADA claim, Plaintiffs argue that Caltrans has no Eleventh Amendment

11  immunity to the extent they seek injunctive relief.  Plaintiffs are correct.  *See, e.g.*, *Henrietta D. v.*

12  *Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003) (agreeing with the Third Circuit that "'[f]ederal

13  ADA claims for prospective injunctive relief against state officials are authorized by the *Ex parte*

14  *Young* doctrine'"); *Armstrong v. Wilson*, 124 F.3d 1019, 1026 (9th Cir. 1997) (stating that

15  "[s]overeign immunity presents no bar to this suit against state officials seeking prospective

16  injunctive relief against ongoing violations of the ADA and RA in the state penal system"); *Razavi*

17  *v. Traffic Court of Santa Clara Cty.*, No. 18-cv-06213-VKD, 2019 U.S. Dist. LEXIS 65839, at

18  *12 (N.D. Cal. Apr. 17, 2019) (stating that "the Eleventh Amendment does not bar federal suits

19  against state officials sued in their official capacities for injunctive relief under Title II of the

20  Americans with Disabilities Act ('ADA') or in their personal capacities for violations of state

21  law").

22  Plaintiffs also seek damages for their ADA claim against Caltrans.  Here, the question is

23  whether Congress abrogated Eleventh Amendment immunity for ADA Title II claims.  This Court

24  must consider two issues in this regard: "first, whether Congress unequivocally expressed its

25  intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid

26  grant of constitutional authority."  *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000).

27  
28  The first question is easily met; "it is undisputed that Congress unequivocally expressed its intent to abrogate Eleventh Amendment immunity in enacting the ADA."  *Vartanian*, 2018 U.S. Dist. LEXIS

United States District Court
Northern District of California

96285; *see* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.").  The Supreme Court has held that the second question requires an inquiry into the facts alleged in each case.

. . . .

[On the second question,] [i]n *United States v. Georgia*, the Court confirmed that section 5 of the Fourteenth Amendment "authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights."  546 U.S. 151, 158 (2006) (quoting *Lane*, 541 U.S. at 559-60 (Scalia, J., dissenting); and citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)).  Thus, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159.

*Kohn v. State Bar of Cal.*, 497 F. Supp. 3d 526, 534-35 (N.D. Cal. 2020) (emphasis added).

Here, Caltrans argues that it has Eleventh Amendment immunity from the Title II damages claim because Plaintiffs have not plausibly alleged conduct that actually violates the Fourteenth Amendment.  According to Caltrans, Plaintiffs have not even alleged a violation of Title II.  *See* Mot. at 15 (arguing that Plaintiffs have not alleged that they are "qualified to participate or receive services offered by Caltrans to the public (encroachment on an interstate facility next to high-speed traffic is not a service offered by Caltrans) or that [they] were excluded from participating in the services offered by Caltrans because of their alleged disabilities").

Whether Plaintiffs have adequately pled an ADA claim is addressed below.  But the critical question for Eleventh Amendment purposes is whether Plaintiffs have adequately pled a *constitutional* violation.  Plaintiffs have not.  Plaintiffs have not shown, *e.g.*, how the failure to accommodate disabled persons has violated the Equal Protection Clause of the Fourteenth Amendment.  *Cf. Kimel*, 528 U.S. at 86 (concluding that there was no valid abrogation of state sovereign immunity with respect to the Age Discrimination in Employment Act; "[t]he Act, through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard").

Both in their opposition and at the hearing, Plaintiffs argued that they have adequately

United States District Court
Northern District of California

alleged a violation of the Fourteenth Amendment based on their state-created danger claim. But Plaintiffs have not demonstrated that they may rely on their state-created danger claim (a due process claim) as a means of establishing abrogation of sovereign immunity for their *ADA* claim. Congress's intent to abrogate sovereign immunity with the ADA was based on a history of unequal treatment of disabled persons – *i.e.*, equal protection. *See Thrope v. Ohio*, 19 F. Supp. 2d 816, 821-22 (S.D. Ohio 1998) (stating that "Congress made specific findings in the ADA that disabled persons are a discrete and insular minority who have faced restrictions and limitations and been subjected to a history of purposeful unequal treatment[;] [t]he ADA thus clearly invokes the Equal Protection Clause of the Fourteenth Amendment, which limits states' ability to discriminate on the basis of classifications"); *cf. Alexander v. Sandoval*, 532 U.S. 275, 279-81 (2001) (noting that "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages"; but "§ 601 'proscribes only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment'"). Plaintiffs' state-created danger claim is not directed to unequal treatment on the basis for disability. Rather, it largely concerns the government's duty not to affirmatively place persons in a position of greater danger – it applies to persons without disabilities as well as those with disabilities.

Plaintiffs' reliance on *Tennessee v. Lane*, 541 U.S. 509 (2004), is misplaced. Admittedly, that case involved both equal protection and due process issues – *i.e.*, the right of two paraplegics who used wheelchairs for mobility to physically access a state court. The Supreme Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34. However, the due process issue was an overlay on what was still, at bottom, an equal protection matter. *See id.* at 524 (noting that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs"). Plaintiffs' attempt to analogize their case to *Lane* falls short because, as noted above, they have not shown that their state-created danger due process claim is founded on the Equal Protection Clause of the Fourteenth Amendment which provides the basis of Congress's authority to enact the ADA. The state-created danger claim covers all campers, regardless of whether they have

11

United States District Court
Northern District of California

1  disabilities.  Although Plaintiffs have alleged that "particularly those with disabilities" will have

2  their health and safety jeopardized by closure of the encampments, SAC ¶ 99, they have not

3  shown this is unequal treatment circumscribed by the Constitution.  *See McLean v. Crabtree*, 173

4  F.3d 1176, 1185 (9th Cir. 1999) ("Proof of discriminatory intent is required to show that state

5  action having a disparate impact violates the Equal Protection Clause.").

6  　　　Accordingly, the Court concludes that Caltrans has Eleventh Amendment immunity for (1)

7  the state-created danger claim under state law (based on *Pennhurst*) and (2) the ADA damages

8  claim (but not the ADA injunctive relief claim) (under *Georgia*).

9  D.  　Failure to State a Claim for Relief

10  　　　Finally, Defendants argue that, standing and immunity issues aside, they are entitled to

11  dismissal because Plaintiffs have failed to state a claim for relief – either for their

12  ADA/Rehabilitation Act claims or for their state-created danger claims.

13  　　　1.  　ADA/Rehabilitation Act Claim

14  　　　Title II of the ADA provides: "no qualified individual with a disability shall, by reason of

15  such disability, be excluded from participation in or be denied the benefits of the services,

16  programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

17  U.S.C. § 12132.  Similarly, § 504 of the Rehabilitation Act provides as follows: "No otherwise

18  qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded

19  from the participation in, be denied the benefits of, or be subjected to discrimination under any

20  program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

21  　　　In the motion, Caltrans argues that Plaintiffs have failed to state a claim under the ADA or

22  the Rehabilitation Act because they have not identified an *existing* program or activity run by

23  Caltrans that they are challenging.  According to Caltrans, Plaintiffs are really asking Caltrans to

24  *create* new substantive benefits, which it is not obligated to do under either statute.  *See* Mot. at

25  20; *see also Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ("It is clear from the

26  language of Title II and the integration regulation that public entities are not required to create new

27  programs that provide heretofore unprovided services to assist disabled persons."); *K.M. v. Tustin

28  Unified Sch. Dist.*, 725 F.3d 1088, 1101 (9th Cir. 2013) ("[T]he ADA effective communication

obligation 'is limited to the provision of services for existing programs; the ADA does not require a school to provide new programs or new curricula.'") (emphasis omitted).

But the Court essentially addressed this argument in its preliminary injunction order:

> Plaintiffs assert that they have a viable Title II claim because Caltrans has implemented a 'program' regarding the removal of homeless encampments (*e.g.*, as reflected in the Interim Guidance) and, under Title II, that program must give reasonable accommodation to disabled persons because they have more difficulty in relocating and/or finding housing and therefore need more time before being evicted.

Docket No. 88 (Order at 11); *see also* SAC ¶ 94 (alleging that "CALTRANS has a program and plans for addressing encampments on CALTRANS property, engages in activities, and expends resources in dealing with encampments and the people inhabiting them. These services, programs, and/or activities do not provide accommodation for people with disabilities").

Caltrans contends that the Interim Guidance is not a program but rather a policy; it then asserts that a declaration of a policy does not give rise to a legally enforceable duty. *See* Reply at 10-11 (citing *Concrete Tie of San Diego, Inc. v. Liberty Const., Inc.*, 107 F.3d 1368, 1372 (9th Cir. 1997) (stating that "[p]olicies are the result of discretionary decisions and are established to guide the agency's employees; a declaration of policy does not create a legally enforceable duty"). However, *Concrete Tie* is not an ADA or Rehabilitation Act case. (The case addressed whether the Small Business Administration owed a duty to a minority-owned small business concern by virtue of a federal set-aside program for minority-owned government contractors.).

Furthermore, it appears that a service, program, or activity covered by Title II can include a policy. Notably, in 42 U.S.C. § 12131(2), "qualified individual with a disability" is defined as

> an individual with a disability who, with or without reasonable modifications to *rules, policies, or practices*, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added). And as the Court noted in its preliminary injunction order,

> the Ninth Circuit's recent decision in *LA Alliance for Human Rights*

United States District Court
Northern District of California

*v. County of L.A.*, No. 21-55395, 2021 U.S. App. LEXIS 28824 (9th Cir. Sept. 23, 2021), . . . indicates that what constitutes a service, program, or activity of a public entity under the ADA should not be narrowly construed. *See id.* at *29 (stating that "Skid Row area sidewalks are a service, program, or activity of the City within the meaning of Title II of the ADA"); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (noting that the question "is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity"; "maintaining public sidewalks is a normal function of a city and without a doubt something that the [City] does" and, therefore, "[m]aintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II") (internal quotation marks omitted). Moreover, even if Caltrans cannot be said to have a "program" for purposes of the ADA, the second clause of Title II still provides that a public entity cannot subject a disabled person to discrimination." Docket No. 88 (PI Order at 11). *See, e.g.*, *Haberle v. Troxell*, 885 F.3d 171, 179-80 (3d Cir. 2018) (noting that, under the "subjected to discrimination" clause, a plaintiff could bring a Title II claim for a police failure to provide reasonable accommodation during an arrest).

Implicitly responsive to the Court's citation to *Barden*, Defendants argue that it is not a normal function of a transportation agency such as Caltrans to maintain homeless encampments. *See* Reply at 11. This is true but it is a normal function of a transportation agency to deal with "encroachments" (as Caltrans has all but conceded through the arguments made in its briefs).

Caltrans protests still that, even if there is a Title II program at issue here, it is not clear what benefits were offered and/or denied under the program. *See* Reply at 11 (arguing that "there is not a single allegation in the SAC that any of the eleven individual plaintiffs were denied any benefit or service offered under the 'program for removing encampments' or any other Caltrans program or service"). Although this argument is not without force, the Caltrans's Interim Guidance articulates what "benefits" are contemplated. For example:

> Where an encampment poses a safety concern necessitating relocation (level 1 or 2), districts should coordinate with local partners and experts on homelessness, working with County Continuums of Care, * cities, the CHP, local authorities, and others to develop a relocation strategy and plan for securing the encampment site once it's cleared.
>
> If relocation is not feasible by local governments or people are not willing to relocate, Caltrans districts and local partners should consider whether alternative locations in the nearby vicinity may be available, consistent with the Centers for Disease Control (CDC) Interim Guidance on People Experiencing Unsheltered Homelessness and the Coronavirus Disease."

United States District Court
Northern District of California

1   Docket No. 35-1 (Interim Guidance at 6).

2          A better argument for Caltrans – which the Court acknowledged in its preliminary

3   injunction order – is that Title II has

> limits, most notably, where an accommodation would fundamentally
> alter the nature of the public entity's activities.  *See, e.g.*, *Rose v.*
> *Rhorer*, No. 13-cv-03502-WHO, 2014 U.S. Dist. LEXIS 64550, at
> *12-13 (N.D. Cal. May 9, 2014) (noting that "the plaintiffs have
> requested automatic shelter extensions, transformation of shelter
> beds into medical respite beds, and dedicated shelters for people
> with disabilities" but "[t]hese requests would fundamentally alter
> San Francisco's emergency adult shelter program, transforming it
> into long-term housing for a small group of people with disabilities,
> and are therefore not required by the ADA").  In the instant case, the
> longer the accommodation is (*i.e.*, giving more time for disabled
> persons to relocate), the stronger the argument Defendants have that
> Caltrans's property is being fundamentally altered to that of
> providing housing, which is outside of its transportation-driven
> duties.  Furthermore, as time progresses and the individual plaintiffs
> are given more time to find alternative housing, Caltrans's duty of
> providing reasonable accommodation is increasingly being met.

13   Docket No. 88 (Order at 12).  But, as Plaintiffs argue, this raises a factual dispute that cannot be

14   resolved at the 12(b)(6) phase.

15          Perhaps recognizing that the Title II/Rehabilitation Act claim could survive 12(b)(6) based

16   on the preliminary injunction order, Caltrans raises a new contention in its reply brief.

17   Specifically, Caltrans asserts that it cannot be held liable for a violation of the ADA or the

18   Rehabilitation Act because its procedures for removing homeless encampments were the results of

19   a state court settlement (*Sanchez*).  *See* Reply at 12; *see also* Defs.' RJN (providing documents

20   filed in *Sanchez*).  The Court would be within its rights to decline consideration of the argument as

21   it could have been raised in the opening motion but was not brought up until the reply brief (thus,

22   depriving Plaintiffs of the opportunity to respond).  Nevertheless, on the merits, the Court does not

23   find Caltrans's position persuasive.

- First, the plaintiffs in *Sanchez* filed suit because Caltrans was conducting sweeps or
  clean-ups of encampments and campers' property was being destroyed in the
  process as they were not being given advance notice of the sweeps.  *See, e.g.*,
  Defs.' RJN, Ex. A (*Sanchez* FAC ¶¶ 2-3) (alleging that "Defendants have regularly
  engaged in 'sweeps' of areas where homeless individuals live, intentionally and

indiscriminately taking and destroying these individuals' personal property," and that "Defendants' sweeps are conducted with no notice, inadequate notice, or misleading notice and in a manner that prevents homeless persons from saving their possessions from destruction"). In other words, the plaintiffs were not directly challenging the closure of encampments.

- Second, even though the settlement agreement in *Sanchez* included a pilot program for future "clean-up *or removal* by Caltrans of a homeless encampment, *see* RJN, Ex. C (Sett. Agmt., Ex. B) (pilot project procedures) (emphasis added), nothing about the agreement precluded future challenge to the removal of an encampment under *any* circumstances (*e.g.*, because of COVID conditions or because of disabled persons' needs). In other words, even if the removal of an encampment is not per se improper, that does not mean that a given removal is not a problem.

The Court therefore denies the motion to dismiss the ADA claim at this juncture, although, as noted above, as the individual plaintiffs are given more time to find alternative housing with the assistance of Caltrans, Caltrans's duty of providing reasonable accommodation is increasingly being met, and Caltrans's position that its property is being fundamentally altered is increasingly strengthened.

### 2. Claim for State-Created Danger

As an initial matter, the Court notes that Plaintiffs technically asserted a claim for state-created danger under both federal and state law. Defendants argue that no such claim has been recognized under *state* law, *see* Mot. at 18 (citing a decision by Judge Donato which noted that there was no authority to demonstrate that California recognizes a state-created danger claim), but the Court need not resolve that issue because (1) Plaintiffs have conceded that Caltrans has Eleventh Amendment immunity for the state law claim and (2) Plaintiffs seem to have dropped the state law claim against any individual defendant by not responding to Defendants' argument in their opposition brief. Thus, the Court may focus on the federal claim only.

Under federal law, "the Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure

1   life, liberty, or property interests." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007).  In

2   other words, "[t]he Due Process Clause is a limitation on state action and is not a 'guarantee of

3   certain minimal levels of safety and security.'"  *Martinez v. City of Clovis*, 943 F.3d 1260, 1271

4   (9th Cir. 2019).

5          That being said, it is well established that "the state may be constitutionally required to

6   protect a plaintiff that it affirmatively places . . . in danger by acting with deliberate indifference to

7   a known or obvious danger."  *Id.* (internal quotation marks omitted).  This is the state-created

8   danger doctrine.

9          "To succeed on [a state-created danger] claim, [a plaintiff] must establish three elements.

10  First, she must show that the [defendant's] affirmative actions created or exposed her to an actual,

11  particularized danger that she would not otherwise have faced.  Second, she must show that the

12  injury she suffered was foreseeable.  Third, she must show that the [defendant was] deliberately

13  indifferent to the known danger."  *Id.*  On the first element, a court "consider[s] 'whether the

14  officers left the person in a situation that was more dangerous than the one in which they found'

15  her."  *Id.*  The first element is not satisfied if "[the defendant] did not make the situation worse for

16  [the plaintiff]" but rather "simply left [the plaintiff] in the same position she was in before the

17  [defendant] had arrived."  *Id.* at 1272.

18                    a.    <u>Danger from Third Party</u>

19         According to Defendants, Plaintiffs do not have a viable state-created danger claim

20  because federal law requires that a plaintiff be harmed by a third party and there is no such third

21  party involved in the instant case.  There is language from some Ninth Circuit case law which

22  could be read to impose such a requirement.  *See, e.g.*, *id.* at 1271 (stating that, "'by its very

23  nature, the [state-created danger] doctrine only applies in situations in which the plaintiff was

24  directly harmed *by a third party*'") (emphasis in original).  However, a review of Ninth Circuit

25  authority establishes that there is, in fact, no such requirement.  Danger could come from, *e.g.*,

26  environmental elements or from preventing access to medical care; no third party need be

27  involved.  *See, e.g.*, *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1062 (9th Cir. 2006) (noting that,

28  in *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), the court held "as viable a

United States District Court
Northern District of California

state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house"; also, in *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000), the court held that "police officers could be held liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on a bitterly cold night"); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (noting that "[t]he Sheriff's officers found [the decedent] facing a preexisting danger from her gunshot wound," and "[t]here is evidence they affirmatively increased that danger by preventing her ambulance from leaving," which "arguably left [the decedent] worse off than if the ambulance had been allowed to bring her to an air ambulance that had advanced medical capabilities and was ready to fly her to a trauma center"); *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (stating that "evidence would support a reasonable jury's finding that [plaintiff's supervisors] acted with deliberate indifference toward the danger posed by toxic mold in [the work facility] to [plaintiff's] health").

### b.    Danger That Would Not Have Otherwise Faced

Defendants argue next that the first element of the state-created danger doctrine has not been met because Defendants' closure of the encampments would not put Plaintiffs in a situation "'more dangerous than the one in which they found' [Plaintiffs]." *Martinez*, 943 F.3d at 1271. Defendants emphasize that there are housing options available to Plaintiffs (such as congregate shelter) and assert that it is safer to be in one of those options (notwithstanding Plaintiffs' contention that their mental disabilities make those options non-viable) instead of remaining living near highways where, *e.g.*, one must cross lanes of traffic to get to some of the encampment sites. Defendants' argument presents a close call.  There are decisions where courts have found a state-created danger claim speculative or implausible.  *See, e.g.*, *Estate of Amos v. City of Page*, 257 F.3d 1086, 1091 (9th Cir. 2000) (stating that "the probability that the conduct of the police officers in this case actually made Amos worse off is extremely speculative"); *Reed v. City of Emeryville*, No. 21-cv-02781-WHO, 2021 U.S. Dist. LEXIS 206500 (N.D. Cal. Oct. 26, 2021) (dismissing state-created danger claim because "plaintiffs do not plausibly plead . . . that defendants put them in a more dangerous situation than they had been in"; "a shelter bed [at St. Vincent de Paul, which

United States District Court
Northern District of California

1    plaintiffs argued was not suitable for persons with mental health disabilities] is safer than an

2    encampment abutting an active construction site").  On the other hand, whether or not closure of

3    the encampments would cause more danger is arguably a factual dispute that cannot be resolved at

4    the 12(b)(6) phase.

5            The Court, however, need not definitively rule on the broader theory because Plaintiffs

6    have a viable claim of danger in light of COVID-19, which now includes not only the Delta

7    variant but also the Omicron variant.  Plaintiffs' contention that closing the encampments will

8    expose them to a greater danger that they would not have otherwise faced if permitted to remain is

9    supported by the CDC's guidance on COVID-19 and homeless encampments.  *See*

10   https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-

11   homelessness.html (last visited 11/18/2021) ("If individual housing options are not available,

12   allow people who are living unsheltered or in encampments to remain where they are.  [¶]

13   Clearing encampments can cause people to disperse throughout the community and break

14   connections with service providers.  This increases the potential for infectious disease spread.").

15   The Court acknowledges that the CDC guidance was given prior to vaccines being made available.

16   Nevertheless, even after vaccines were made available, the agency has not changed its guidance on

17   homeless encampments.  Furthermore, even with vaccination, there are breakthroughs, and

18   breakthroughs may become more common as variants continue to arise, as indicated by Omicron.

19   To the extent Defendants argue that there is no real risk here because housing options are available

20   to Plaintiffs, Plaintiffs assert (as noted above) that those options are not viable given their mental

21   disabilities and thus raise a factual question.  Moreover, the CDC guidance refers to "individual

22   housing" being available where an encampment is dispersed, and not, *e.g.*, congregate shelters.

23   Whether this was an oversight on the part of the CDC or a deliberate decision taking into account

24   the risk of COVID-19 spread in congregate living is not something that can be gleaned on the

25   record before the Court, particularly given the procedural posture of the case (*i.e.*, 12(b)(6)).  To

26   be sure, to the extent Defendants can demonstrate the risk of COVID-19 can be mitigated by

27   shelter procedures and, *e.g.*, a vaccination program made available to campers, the concerns

28   underlying the CDC guidance may be obviated and the state-created danger potentially obviated.

1  But that is a matter that cannot be resolved on a 12(b)(6) motion.

2          c.     Deliberate Indifference

3         Finally, Defendants contend that there are insufficient allegations that they acted with

4  deliberate indifference.  "Deliberate indifference requires a culpable mental state more than gross

5  negligence."  *Pauluk*, 836 F.3d at 1125 (internal quotation marks omitted).

6             The state actor must recognize an unreasonable risk and actually

7             intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff.  In other words, the state actor must

8             have known that something was going to happen, but ignored the risk and exposed the [plaintiff] to it anyway.

9  *Martinez*, 943 F.3d at 1274 (internal quotation marks omitted); *see also Hernandez*, 897 F.3d at

10  1135 (stating the same).

11         As a preliminary matter, the Court finds there is enough alleged in the complaint to create

12  a factual dispute on deliberate indifference with respect to COVID conditions, particularly in light

13  of the CDC guidance.

14         Although a closer call, the Court also finds a sufficient basis for deliberate indifference

15  based on Plaintiffs' theory that the closure of the encampments leaves them with no place to go.

16  The Court acknowledges that there some allegations in the SAC suggesting that Defendants have

17  not entirely ignored the plight of campers – *e.g.*, by allowing the encampments to exist on Caltrans

18  property for several years.  *See* SAC ¶ 1 (alleging that WDWG has served encampments on

19  property owned by the state and operated by Caltrans for "two years"); SAC ¶ 38 (alleging that

20  WDWG "has partnered with CALTRANS to clean all three subject encampments, without moving

21  residents, for over a year"); SAC ¶ 40 (alleging that Ashby Shellmound has "been in existence for

22  approximately three years").  More to the point, Defendants also appear to have worked with

23  counsel representing Plaintiffs for at least some period on finding housing for the original named

24  individual plaintiffs in this case.  On the other hand, if Defendants are moving forward with the

25  closure of the encampments with knowledge that available housing options may not be viable and

26  without sufficient attempt to address alternatives (*e.g.*, alternative encampment sites on state

27  property, alternative housing options supported by local jurisdictions), a reasonable jury might

28  well find Defendants to be deliberately indifferent.  Defendants' continued efforts (or not) in this

United States District Court
Northern District of California

20

1   regard may be important to the analysis.

2          The Court therefore denies the motion to dismiss the federal state-created danger claim.

3   E.       Individual Liability of Ms. El-Tawansy

4          Because the state-created danger claim survives (because of, at the very least, the COVID-

5   19 problem), the Court must finally address whether Ms. El-Tawansy may be held individually

6   liable for the claim.  At this juncture, Ms. El-Tawansy is not raising a qualified immunity

7   argument, *but see* Reply at 14 n.2 (indicating that qualified immunity will likely be raised); rather,

8   her point is that there are no allegations in the complaint as to what actions she took or omissions

9   she made.  In response, Plaintiffs argue as follows:

10          Plaintiffs allege that defendant El-Tawansy, the director of District
            4, has jurisdiction over the Caltrans property on which the
11          encampments exist and whose clearance is at the heart of this
            complaint.  (SAC ¶ 31.)  Plaintiffs allege that she is responsible for
12          implementing programs and policies regarding those encampments
            and the people experiencing homelessness who have been their
13          inhabitants.  (*Id.*)  She is specifically responsible for the
            implementation of those programs and plans which have impacted
14          the people in those encampments including plaintiffs.  (*Id.*)
            According to Caltrans' Interim Guidance on Encampments the
15          clearing of Priority Level I and Priority Level II encampments (the
            only encampments which are to be cleared according to the
16          guidelines) *requires approval by the District Director* and the
            submission to that director of an after action report one week after
17          the conclusion of a relocation of an encampment.  (ECF No. 35, Ex.
            4, p. 4.)  In this case, under the guidelines, defendant El-Tawansy
18          had to have personally approved all the actions of Caltrans and its
            employees in clearing the encampments in a manner that violated
19          the constitutional rights of plaintiffs.

20   Opp'n at 25 (emphasis added).  In reply, Defendants argue that Plaintiffs did not clearly include all

21   of the above allegations in the SAC – most notably, her approval of the closure of an encampment.

22   Though this is a fair point, that is something that may easily be remedied with an amendment, and,

23   with that amendment, there would appear to be a plausible basis for individual liability.

24   Accordingly, the Court dismisses the claim against Ms. El-Tawansy in her individual capacity but

25   gives Plaintiffs leave to amend to correct this deficiency.

26                                    **III.     CONCLUSION**

27          For the foregoing reasons, the motion to dismiss is granted in part and denied in part.

28          The Court dismisses the state-created danger based on state law in its entirety.  The Court

United States District Court
Northern District of California

also dismisses the ADA damages claim against Caltrans.  Finally, the Court dismisses the federal state-created danger claim against Ms. El-Tawansy in her individual capacity (but gives Plaintiffs leave to amend).  Plaintiffs' claims otherwise shall be allowed to proceed at this juncture. Plaintiffs shall file an amended complaint with respect to the state-created danger claim against Ms. El-Tawansy within four weeks of the date of this order.  The Court's rulings here do not preclude Defendants from arguing in the future that any ADA obligations have in fact been met and/or that good-faith attempts to find viable alternative housing and provide COVID protection negates the deliberate indifference required for Plaintiffs' federal state-created danger claim.

This order disposes of Docket No. 90.


**IT IS SO ORDERED**.


Dated: December 16, 2021

_____
EDWARD M. CHEN
United States District Judge