DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
emilyrose@siegelyee.com

ANDREA M. HENSON, SBN 331898
BRIGITTE NICOLETTI, SBN 336719
EAST BAY COMMUNITY LAW CENTER
1950 University Avenue Suite 200
Berkeley, CA 94704
Telephone: (510) 977-2511
Email: ahenson@ebclc.org; bnivoletti@ebclc.org

OSHA NEUMANN SBN 127215
LAW OFFICES OF OSHA NEUMANN
1840 Woolsey St.
Berkeley, CA 94703
Telephone: (510) 717-8604
Email: oshaneumann@gmail.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHERE DO WE GO BERKELEY, on behalf of itself and those it represents; RONNIE BROOKS; JASON MILLER; KINNDRA MARTIN; KEVIN CODDINGTON; JONATHAN JAMES; MARIAH JACKSON; SARAH TEAGUE; TERRY LEE WALKER; JOSE MORFIN; ALHONDRO MYERS; and SHAWNA GARCIA,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>CALIFORNIA DEPARMENT OF TRANSPORATION (Caltrans), et al.<br><br>　　　　　Defendants. | Case No.: 21-CV-04435-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　March 23, 2022<br>Time:　9 a.m.<br>Ctrm:　5 – 17th Floor<br>　　　　450 Golden Gate Avenue,<br>　　　　San Francisco, CA 94102 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO DEFENDANTS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, on March 23, 2021, at 2:30 p.m. or as soon thereafter as the matter may be heard, at the United States District Court, Northern District of California, Courtroom 5, 450 Golden Gate Avenue, San Francisco, CA 94102, plaintiffs Where Do We Go Berkeley, Ronnie Brooks, Jason Miller, Kinndra Martin, Kevin Coddington, Jonathan James, Mariah Jackson, Sarah Teague, Terry Lee Walker, Jose Morfin, Alhondro Myers, and Shawna Garcia will and hereby does move the Honorable Edward M. Chen to issue a preliminary injunction against defendants enjoining them from removing plaintiffs and other residents from where they are encamped on California Department of Transportation property before they are offered and can enter adequate accessible alternative shelter. This motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure, and is supported by this Notice of Motion, the Memorandum of Points and Authorities below, the declarations filed herewith, and the exhibits attached thereto, the papers and pleadings on file in this action, and such other oral and documentary evidence as may come before the Court upon the hearing of this matter.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 2

      A.   Current Residents of the Ashby Shellmound and Ashby West Encampments. ...... 2

      B.   Caltrans' Interim Guidance and the Centers for Disease Control and Prevention
           Guidance Remain in Effect. ........................................................................... 2

      C.   Efforts to Find Accessible Shelter for the Plaintiffs in This Case. ........................... 2

      D.   Working with Plaintiffs with Disabilities. ............................................................ 5

      E.   Prospects for Finding Placements for Plaintiffs. ................................................. 6

           1.   Placement at the Rodeway Inn by City of Berkeley. ..................................... 7

           2.   Placement through Community Queue. ..................................................... 7

           3.   Return to Seabreeze. ............................................................................... 7

      F.   New Resources Offered by Caltrans ................................................................ 9

           1.   General Services Funding to Relocate Homeless Residents and Transition
                them to Housing. ..................................................................................... 9

           2.   Caltrans' Housing and Homelessness Solutions Lead ................................. 9

III.  ARGUMENT ..................................................................................................... 10

      A.   Plaintiffs Are Likely to Suffer Immediate and Irreparable Harm if a New
           Preliminary Injunction Does Not Issue. ......................................................... 11

      B.   The Immediate Injury to Plaintiffs Outweighs Any Hypothetical Harm That a
           Preliminary Injunction Might Cause the Defendants .......................................... 12

      C.   Plaintiffs Have Raised "Serious Questions on the Merits" of Their Americans with
           Disabilities Act Claims. ................................................................................. 13

           1.   The American with Disabilities Act Applies to "Anything a Public Entity
                Does," and Caltrans' Program is Not Exempt. .......................................... 14

           2.   An Accommodation of Extra Time to Locate Accessible Housing is
                Necessary, to Prevent Caltrans from forcing Plaintiffs with Disabilities Out
                of the Only Shelter they Have, with Nowhere Else to Go. ............................ 17

           3.   Allowing Plaintiffs to Remain Where They are for up to Four More
                Months—or Restoring the *Status Quo ante Litem* by Allowing Them to
                Return to "Seabreeze" for the Same Period—would not Fundamentally alter
                Caltrans' Encampment-Relocation Program. ............................................ 19

      D.   Serious Questions Have Been Raised as to Plaintiffs' Claim for Violation of Their
           Substantive Due Process Rights to Be Free from State Created Danger. ............. 22

      E.   A New Preliminary Injunction Is in the Public Interest. ....................................... 24

IV.   CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ................................................. 10

*Arizona Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ................................................ 10

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity,*
    950 F.2d 1401 (9th Cir. 1991) ................................................ 11

*Barden v. City of Sacramento,*
    292 F.3d 1073 (9th Cir. 2002) ................................................ 15

*Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch,*
    179 F.3d 725 (9th Cir. 1999) ...................................... 14, 15, 16

*Chalk v. U.S. Dist. Ct. Cent. Dist. of California,*
    840 F.2d 701 (9th Cir. 1988) ................................................. 11

*Cohen v. Culver City,*
    754 F.3d 690 (9th Cir. 2014) ............................... 13, 14, 15, 17

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1996) .......................... 15, 16, 17, 19

*DeShaney v. Winnebago County Dep't of Soc. Serv.,*
    489 U.S. 189 (1989) ............................................................. 23

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) ........................................ 10, 13

*Feldman v. Arizona Sec'y of State's Office,*
    843 F.3d 366 (9th Cir. 2016) ................................................ 13

*Fortyune v. Am. Multi-Cinema, Inc.,*
    364 F.3d 1075 (9th Cir. 2004) .............................................. 19

*Garcia v. City of Los Angeles,*
    481 F. Supp. 3d 1031 (C.D. Cal. 2020) ................................. 24

*GoTo.com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000) .............................................. 10

*Hason v. Med. Bd. of Cal.,*
    279 F.3d 1167 (9th Cir. 2002) ........................................ 14, 15

*Indep. Living Ctr. of S. California, Inc. v. Shewry,*
    543 F.3d 1047 (9th Cir. 2008) .............................................. 10

*Kennedy v. City of Ridgefield,*
    439 F.3d 1055 (9th Cir. 2006) .............................................. 23

*Lentini v. Cal. Ctr. for the Arts, Escondido,*
    370 F.3d 837 (9th Cir. 2004) ................................................ 19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir.2009)..................................................................10

*Martin v. PGA Tour, Inc.,*
   204 F.3d 994 (9th Cir. 2000) .............................................................19

*McGary v. City of Portland,*
   386 F.3d 1259 (9th Cir. 2004) .....................................................passim

*Nken v. Holder,*
   556 U.S. 418 (2009) ..........................................................................10

*Rodde v. Bonta,*
   357 F.3d 988 (9th Cir. 2004) ............................................................18

*Sanchez v. City of Fresno,*
   914 F. Supp. 2d 1079 (E.D. Cal. 2012) ............................................ 23

*Sausalito/Marin Cty. Chapter of Califormia Homeless Union v. City of Sausalito,*
   No. 21-CV-01143-EMC, 2021 WL 783571, at *1 (N.D. Cal. Mar. 1, 2021) ........................ 23

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
   709 F.3d 1281 (9th Cir. 2013) ...........................................................10

*Shell Offshore, Inc. v. Greenpeace.,*
   709 F.3d 1281 (9th Cir. 2013) ...........................................................12

*Tamara v. El Camino Hosp.,*
   964 F. Supp. 2d 1077 (N.D. Cal. 2013)..............................................11

*U.S. Airways, Inc. v. Barnett,*
   535 U.S. 391 (2002) ..........................................................................17

*Wong v. Regents of Univ. of Cal.,*
   192 F.3d 807 (9th Cir. 1999) .............................................................17

*Yeskey v. Pa. Dep't of Corr.,*
   118 F.3d 168 (3d Cir.1997) ...............................................................15

**STATUTES**

42 U.S.C. § 12101(b)(1).......................................................................14

42 U.S.C. § 12102(1) ...........................................................................13

42 U.S.C. § 12102(4)............................................................................13

42 U.S.C. § 12131(2)............................................................................13

42 U.S.C. § 12132 ...............................................................................14

**OTHER AUTHORITIES**

H.R.Rep. No. 101–485(II)....................................................................15

**REGULATIONS**

28 C.F.R. § 35.104 ..............................................................................14

28 C.F.R. § 35.130(b)(7)(i) .............................................................. 17, 19

28 C.F.R. Pt. 35, App. B ................................................................................................................... 15

## I.     INTRODUCTION

Plaintiffs are homeless and disabled. They resided on Caltrans rights of way for years in Berkeley, California until Caltrans evicted them in August 2020. With no safe accessible alternative indoor location to reside, plaintiffs moved south and established encampments at Ashby Shellmound and a location west of the freeway, referred to as Ashby West.

Plaintiffs sought and were granted a six month preliminary injunction to stay Caltrans enforcement actions that would disproportionately impact them as persons with disabilities— since housing navigation processes take longer due to accommodations required during outreach and accommodations needed in housing and shelter options. Since the issuance of the six month preliminary injunction, plaintiffs have been enrolled in critical services that will aid them in being connected to permanent housing. However, due to unforeseen setbacks in the County of Alameda's coordinated entry system and the operation of the Rodeway Inn, plaintiffs now seek a four month preliminary injunction to bridge the gap between the expiration of the six month injunction and the potential for them to enter the Rodeway Inn under City of Berkeley management.

An additional four month stay of enforcement activity is a reasonable accommodation to plaintiffs, who experience barriers to receiving housing due to their disabilities. The stay on enforcement would not fundamentally alter Caltrans' program because the program at issue— Caltrans' Interim Guidance on Encampments—has a stated goal and purpose that expressly includes working with community partners to "develop a relocation strategy" for encampments instead of pushing houseless people from place to place "without resolving the core issues associated with homelessness."

In addition, the current state of the novel coronavirus supports a four month stay in enforcement activity. The Centers for Disease Control and Prevention's guidance still commands that encampments remain in place unless individual indoor housing options are available to residents, and Caltrans' adherence to this guidance at Seabreeze and Downstairs in the height of the pre-vaccine pandemic suggests that this is not an unreasonable or unfeasible option.

## II.   STATEMENT OF FACTS

### A.   Current Residents of the Ashby Shellmound and Ashby West Encampments.

Currently seven of the original eleven plaintiffs who brought this action in their Second Amended Complaint are still living in the Ashby encampments. Six plaintiffs, Kevin Coddington, Sarah Teague, Alhondro Myers, Kinndra Martin, Jonathan James and Terry Lee Walker, Jr., are at Ashby West and one plaintiff, Shawna Garcia, lives at Ashby/Shellmound. (Declaration of Andrea Henson in Support of Plaintiffs' Motion for Preliminary Injunction ("Henson Decl.") ¶ 4.) When the Court issued its preliminary injunction on September 27, 2021, there were sixteen non-plaintiffs living at the Ashby encampments. (ECF No. 88 at 2:25-26.) Currently there are six non-plaintiffs living at the Ashby encampments, four at Ashby West and two at Ashby/Shellmound. (ECF No. 122.)

### B.   Caltrans' Interim Guidance and the Centers for Disease Control and Prevention Guidance Remain in Effect.

Caltrans' Interim Guidance on Encampments issued June 2021. (ECF No. 35-1.) The guidance established a program for encampment removal that calls upon Caltrans to work with local partners to find alternative housing for residents of encampments that it seeks to close. (ECF No. 35-1.) The program also directs Caltrans to consider alternative state land to which it can direct residents. (ECF No. 35-1.) This guidance has not changed. In addition, the Centers for Disease Control and Prevention has maintained its guidance that "[i]f individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are."[1]

### C.   Efforts to Find Accessible Shelter for the Plaintiffs in This Case.

Of the eleven original plaintiffs in this matter, ten transition to housing through the Rodeway Inn. (Henson Decl. ¶ 3.) Of the plaintiffs from the Second Amended Complaint, Mariah Jackson got housed, Terry Lee Walker Jr. has been accepted to Horizon and is considering whether he can enter, and he and Alhondro Myers, Kinndra Martin, Jonathan

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#facility-encampments (last updated February 10, 2022).

---

James, and Kevin Coddington have all applied for social security disability income ("SSDI"), which is a necessary step to affordable housing. (Henson Decl. ¶¶ 4, 43-44; Declaration of Ian Cordova Morales Rogers in Support of Plaintiff's Motion for Preliminary Injunction ("Rogers Decl.") ¶¶ 26-28.) Sarah Teague already receives SSDI, and Shawna Garcia has general assistance and has submitted an application for SSDI. (Declaration of Kevin Coddington ("Coddington Decl.") ¶ 10; Henson Decl. ¶ 9.)

From the beginning of this litigation, plaintiffs' attorneys, Where Do We Go Berkeley, and various service providers have worked to find alternative shelter for plaintiffs living at the Ashby encampments. When Caltrans evicted the current eleven plaintiffs from the encampments where they had been living at the Seabreeze and Downstairs, plaintiffs' attorneys, Where Do We Go Berkeley, and service agencies such as Lifelong Medical, resumed efforts to find housing that would be accessible and affordable for them, given their disabilities.

Ian Rogers, the lead organizer for Where Do We Go Berkeley, who is now also employed by the Homeless Action Center ("HAC"), has reached out to plaintiffs at the Ashby West encampment and endeavors to keep in contact with them, not only for HAC, but also for other service organizations such as Lifelong Medical and Bay Area Community Services ("BACS"), which asked him to contact people living at Ashby West, because they no longer willing or able to go to that location. (ECF No. 78-10 at 4:9-13.)

Since there was no sanctioned encampment to which plaintiffs could relocate, and no immediate sources for housing, Mr. Rogers attempted to set up a temporary encampment for Plaintiffs and others Caltrans had evicted. He chose a location on the west side of Aquatic Park in Berkeley. That location had, at one time, been suggested by the current deputy Berkeley city manager.  Unfortunately, this time, the City posted notices that an encampment at that site would not be permitted, and Where Do We Go Berkeley had to take it down. (ECF No. 78-10 at 4:24-5:1.)

Plaintiffs themselves have not stopped trying to find housing. Jonathan James moved into an apartment with other formerly homeless residents, but his anxiety and PTSD caused him to have to get up and leave during the night. (Declaration of Jonathan James ("James

Decl.") ¶¶ 3-5.) This disturbed his roommates and he ultimately had to move out. (James Decl. ¶ 6.) Kinndra Martin to the Wood Street Encampment in Oakland and lived with a friend. (Declaration of Kinndra Martin ("Martin Decl.") ¶ 2.) The environment and Wood Street felt unsafe, unsanitary and dangerous so in January 2022, she moved back to Ashby West. (Martin Decl. ¶ 3.) Terry Lee Walker, Jr. has been accepted into Horizon and he is figuring out whether he can enter the shelter. (Henson Decl. ¶¶ 43-44.) Alhondro Myers has been working with a social worker from People's Park to access housing navigation services. (Declaration of Alhondro Myers ("Myers Decl.") ¶ 3.) Kevin Coddington was on the Coordinated Entry housing list. (Declaration of Kevin Coddington ("Coddington Decl.") ¶ 3.) However, when he was evicted from Seabreeze and found himself at Ashby West, his housing navigator no longer contacted him and he discovered that he now has to be reassessed. (Coddington Decl. ¶ 3.) Recently he has begun the process of applying for SSI by completing a referral to HAC and he is addressing certain legal barriers to housing with his attorney. (Coddington Decl. ¶ 4.) Applying for social security and other benefits is a crucial step in getting access to subsidized housing. (Rogers Decl. ¶ 3.)

While plaintiffs have been working to put themselves in a position to take advantage of housing opportunities that might become available, plaintiffs' attorneys have been working to secure those opportunities by advocating for plaintiffs with the City of Berkeley, the County of Alameda, Caltrans, and social service agencies that have access to housing resources.

Recently, plaintiffs' attorney Andrea Henson began a new position at East Bay Community Law Center ("EBCLC"). (Henson Decl. ¶ 5.) She is now able to dedicate substantial amounts of time locating and negotiating housing options for plaintiffs. (Henson Decl. ¶ 5.) Ms. Henson now access to more resources such as the Homeless Management Information System ("HMIS"), access that will streamline the housing process for the plaintiffs. (Henson Decl. ¶ 6.) Previously, counsel had to rely on workers and agencies to access this information. (Henson Decl. ¶ 6.) Additionally, Ms. Henson has more direct outreach with homeless individuals and their providers. (Henson Decl. ¶ 7.) This close contact with the provider community offers the latest updates related to the plaintiffs' housing. (Henson Decl. ¶ 7.)

In February 2022, Ms. Henson spoke with Heather Frankel, Managing Attorney at the Homeless Action Center (HAC). (Henson Decl. ¶ 8.) Ms. Frankel informed her of a recent policy change that allows HAC to take SSI/SSDI referrals from providers directly. (Henson Decl. ¶ 8.) Now Ms. Henson can refer clients to HAC so that they can receive assistance filing for the SSI/SSDI benefits under funding from the City of Berkeley. (Henson Decl. ¶ 8.) These new changes provide increased services and resources to plaintiffs from EBCLC and HAC. (Henson Decl. ¶ 12.).

There are currently four rooms available at the Rodeway Inn as individuals have moved into permanent housing and two more rooms will be available shortly. (Henson Decl. ¶ 13.) In order for residents to be placed at the Rodeway, they have to be referred by a Lifelong Medical. (Henson Decl. ¶ 14.) When Ms. Henson sought referrals for six plaintiffs through Lifelong Medical, she was informed that referrals to the Rodeway Inn ended in January 2022. (Henson Decl ¶ 16.) Kerry Abbott, Director of Homeless Care and Coordination with Alameda County explained that the Rodeway Inn was not accepting new clients because the FEMA funding that support Project Roomkey is ending at the end of March 2022 and the final closing date is at the end of April. (Henson Decl. ¶ 17.)

However, in June 2022, the City of Berkeley will be taking over the Rodeway Inn using a $4.7 million grant awarded from the state. (Henson Decl. ¶¶ 21, 27.) Upon learning this, Ms. Henson started negotiations to place plaintiffs in the Rodeway once it is operated by the City of Berkeley. (Henson Decl. ¶¶ 22-23, 26-30.) The prospects are promising but not certain.

**D. Working with Plaintiffs with Disabilities.**

Mr. Rogers and his five person team at HAC work with plaintiffs and aid them in becoming document ready and receive financial assistance. (Rogers Decl. ¶ 29.) Having clients with a stable place to live has been immeasurably helpful in these efforts, especially where the mental health needs of the clients require outreach workers to provide additional time, effort and instruction to accomplish tasks necessary for accessing housing. (Rogers Decl. ¶ 31.) The stability eases clients' tension about leaving the encampment to accomplish tasks, and it makes it possible for HAC to return day after day if that is what is necessary to accomplish the work. (Rogers Decl. ¶ 31.) It takes persistence to help clients overcome barriers associated with mental

health disabilities. (Rogers Decl. ¶ 8.) Mr. Rogers has to build in more time for every appointment and meeting. (Rogers Decl. ¶ 8.) He repeats instructions every time he does outreach. (Rogers Decl. ¶ 8.) He provides as much paperwork as possible, giving multiple copies of documents in case one gets lost. (Rogers Decl. ¶ 8.) He tries to anticipate every mistake that someone will make to help them navigate a very complicated system. (Rogers Decl. ¶ 8.) He must make accept when clients become overwhelmed and need to terminate an activity, like going to the DMV, because there are too many people or the lines are too long. (Rogers Decl. ¶ 20.) The bottom line is that working with persons with mental health disabilities simply takes more time.

### E.   Prospects for Finding Placements for Plaintiffs.

Following a six month injunction, one plaintiff have moved indoors, one plaintiff is considering Horizon, and all seven plaintiffs who remain at the Ashby encampments are connected to housing navigators through HAC or another navigator they trust. (Henson Decl. ¶¶ 4, 9.) Mr. Myers and Mr. Walker are getting mental health treatment with Berkeley Mental Health. (Henson Decl. ¶ 25.) HAC has dedicated a five person team to assist plaintiffs and the residents at the Ashby encampments with applications for social security income, which is a prerequisite to accessing affordable housing. (Rogers Decl. ¶¶ 28-29.) These are accomplishments that would not have been possible but for the stability that the injunction created. (Rogers Decl. ¶ 31.)

Although plaintiffs' counsel was originally hopeful that six months would be sufficient time to make these connections to housing or move people into vacancies at the Rodeway, certain unexpected events made that impossible. First, Alameda County ended the Coordinated Entry System and established a new system, Community Queue, which eliminated the position of certain residents in the housing queue. (Rogers Decl. ¶ 22.) Mr. Coddington and resident Leah Borowitz were removed from the top of the list as a result of this change. (Rogers Decl. ¶ 23, 26.) Second, as described above, the Rodeway Inn stopped accepting intakes into vacant rooms in January 2022 in anticipation of ending County of Alameda operation in April 2022. (Henson Decl. ¶ 16.)

Despite these setbacks, there are opportunities and resources currently available to place plaintiffs living at the Ashby encampments in some form of accessible shelter or housing in the next four months:

### 1.   Placement at the Rodeway Inn by City of Berkeley.

The City of Berkeley received a grant of $4.7 million from the California Interagency Council on Homelessness Encampment Resolution Funding Grant Program (RJN, Ex. 2) The purpose of the grant is to "provide pathways to permanent housing for individuals experiencing unsheltered homelessness." (RJN, Ex. 3.) The program is designed to fund projects that "[p]rioritize the most unsafe and/or persistent encampments around the state, the Governor's direction to focus on high-priority encampments that pose the greatest threat to health and safety." (RJN, Ex. 3.) The City of Berkeley will use these funds to take over the Rodeway Inn from the County of Alameda. (Henson Decl. ¶ 21.)

Although the Rodeway is not accepting new admissions at the moment, Ms. Henson discussed with a Berkeley Councilmember about placing plaintiffs in the Rodeway in June 2022 when the City first takes over operation. (Henson Decl. ¶¶ 26-30.) The proposal was well received by the Councilmember, who is lobbying Berkeley Deputy City Manager Paul Buddenhagen to accomplish it. (Henson Decl. ¶¶ 26-30.)

### 2.   Placement through Community Queue.

As outlined above, all of the remaining plaintiffs are working with HAC and other service providers to obtain benefits and assistance in housing navigation. (Rogers Decl. ¶¶ 27-28.) Plaintiffs' chance of obtaining housing depends on how they rank on that scale. At present that remains an unknown. An added concern is that many housing navigation providers do not yet understand the new Community Queue assessment process so that there is a delay in completing the assessment and more importantly, in locating their homeless clients because they have been displaced since the CES list closed. (Henson Decl. ¶ 37.) However, EBCLC and HAC are seeking more resources to assist plaintiffs through this process. (Henson Decl. ¶ 36.)

### 3.   Return to Seabreeze.

Given the moving target created by the closure of CES and creation of the Community Queue and the transitions occurring at the Rodeway Inn, more time is needed to house the

1   plaintiffs who remain at the Ashby encampments. With Mr. Rogers and Ms. Henson being now

2   able to provide more direct assistance to plaintiffs through their new positions and possibly

3   with the aid of the Caltrans Homelessness and Housing Solutions Lead, having plaintiffs housed

4   in four months is an achievable goal. It is, however, not a certainty.

5        The Court could order Caltrans to allow the Seabreeze site to be opened for a temporary

6   time-limited encampment. The site will be safer and more easily access by service providers

7   than the Ashby encampments.

8        If Seabreeze was opened up as a temporary transitional place for plaintiffs to shelter, Ian

9   Rogers the President and lead advocate of Where Do We Go Berkeley (WDWGB) has indicated

10  his organization could provide porta parties and wash stations, fire abatement equipment in

11  the form of fire extinguisher and fireballs, tent heathers, and other resources through the end

12  of the post injunction. (Rogers Decl. ¶ 32.) It could help people move their belongings the

13  current campsite. (Rogers Decl. ¶ 33.) WDWGB is prepared to continue supporting plaintiffs as

14  long as they are at the Ashby encampments but to provide more resources at the Seabreeze

15  such as trash mitigation and removal. (Rogers Decl. ¶ 34.) The Seabreeze also would be easier

16  to access by other organizations. (Rogers Decl. ¶ 34.)

17       Since the outset, the option of allowing an encampment at the Seabreeze site has been

18  repeatedly and firmly rejected by Caltrans. Nevertheless, if plaintiffs were to move back to the

19  Seabreeze, it would simply restore the status quo that existed before their eviction and the filing

20  of the Second Amended Complaint in this case. It would also, as the Court pointed out in its

21  Order, immediately mitigate some of the damages, which Caltrans claims it has suffered as a

22  result of the continuing existence of the Ashby encampments. The Court noted in its September

23  27, 2021 order, "Defendants are in a position to mitigate the risk associated with the

24  encampments at issue [the Ashby encampments] by allowing campers to stay, on a temporary

25  basis a different Caltrans property that poses less than danger – i.e., at Seabreeze . . ." (ECF No.

26  88 at 9:6-8.) The Court also noted that "Caltrans had been in discussion earlier this year [2021]

27  with the City of Berkeley to locate a homeless shelter at Seabreeze." (ECF No. 88 at 9:12-14) The

28  site had been identified by the California State Department of General Services as suitable "to

provide shelter for individuals who are homeless," pursuant to an order issued by Gov. Newsom to mobilize state resources to combat the crisis of homelessness. The order included a request to all counties, cities, *public transit agencies* [emphasis added] to examine their own ability to provide shelter and house homeless individuals on a short-term emergency basis . . ." (ECF No. 55, Ex 1. at 4.) Caltrans has presented no viable argument against allowing a sanctioned encampment at Seabreeze; they simply repeat their belief that as a transit agency they should not be required to engage with the crisis of homelessness. The governor of California believes otherwise.

### F.   New Resources Offered by Caltrans

#### 1.   General Services Funding to Relocate Homeless Residents and Transition them to Housing.

California's 2021-2022 budget provides substantial funding to Caltrans for additional services for homeless residents and programs for relocation coordination and clean up. According to the Legislative Analyst's Office, "Caltrans' 2021-2022 budget provides [Homelessness Coordinating and Financing Council] $50.3 million one-time General Fund to establish a competitive grant program for cities, counties and [regions serviced by the continuum of care] to support encampment resolution and the transition of individuals into housing. Prioritization for funding will be given to applicants with encampments of 50 or more individuals." (Exhibit 1 to Plaintiff's Request for Judicial Notice in Support of Plaintiff's Motion for Preliminary Injunction ("RJN") at 12.) "The budget also provides funding to [Caltrans] in 2021-22 to address encampments, including (1) $2.7 million General Fund for encampment relocation coordination and homeless services liaisons, (2) $20.6 million special funds for the removal of hazardous material at encampments, and (3) $25 million General Fund is set aside from the larger Clean California budget action to clean up encampments." (RJN, Ex. 1 at 12.)

#### 2.   Caltrans' Housing and Homelessness Solutions Lead

Caltrans has started a new Housing and Homelessness Solutions Planning Program. The purpose of the Program is to "identify best practices and deploy solutions with long-term benefit." Abigail Jackson, Caltrans Senior planner has been appointed to lead the program. (RJN, Ex. 4.) Plaintiffs know little about this program, but Ms. Jackson appears to have held the

1  position for only two months and there is promise that with her dedication, plaintiffs can

2  receive more assistance from Caltrans than has currently been offered.

3  **III.   ARGUMENT**

4      This Court may issue a preliminary injunction if it finds "serious questions going to the

5  merits and a hardship balance that tips sharply towards the plaintiff can support issuance of an

6  injunction," so long as the plaintiff also shows that there is a likelihood of irreparable injury and

7  that the injunction is in the public interest.[2] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

8  1132 (9th Cir. 2011) (internal quotation marks omitted).

9      This "serious questions" standard "permits a district court to grant a preliminary

10  injunction in situations where it cannot determine with certainty that the moving party is more

11  likely than not to prevail on the merits of the underlying claims, but where the costs outweigh

12  the benefits of not granting the injunction." *Id.* at 1133 (emphasis added) (citation omitted).

13  This standard requires a "lesser showing than likelihood of success on the merits." *Shell*

14  *Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). A question is serious

15  enough to support issuance of an injunction if there is at least "some support" on the record the

16  underlying claims. *Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1047, 1050 (9th

17  Cir. 2008) (emphasis added).

18      Where an injunction seeks to "prohibit[] a party from taking action and preserve[] the

19  status quo pending a determination of the action on the merits", it is a prohibitory, as opposed

20  to a mandatory, injunction. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir.

21  2014) (*quoting Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–

22  79 (9th Cir.2009). "The status quo *ante litem* refers not simply to any situation before the filing

23  of a lawsuit, but instead to the last uncontested status which preceded the pending

24  controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (internal

25  citations and quotations omitted). An injunction may therefore require a party to take action to

26  restore the status quo without becoming a mandatory injunction. *Id.*

27

28  [2] Where the government is a party the balance of equities and public interest analyses are merged. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co*, 747 F.3d at 1092.

**A.** **Plaintiffs Are Likely to Suffer Immediate and Irreparable Harm if a New Preliminary Injunction Does Not Issue.**

"A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011). A preliminary injunction may issue where the events that will cause plaintiffs harm are probable based on the evidence before the court. *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D. Cal. 2013) (issuing a preliminary injunction against a hospital based on the likelihood from plaintiff's allegations that she would again find herself in that hospital and concluding that it was probable that she would be exposed to the same harm complained of.) Constitutional infringement can constitute irreparable harm. *Santa Cruz Homeless Union*, 514 F. Supp. 3d at 1145 (N.D. Cal. 2021) (quoting *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)). Additionally, where a statute is designed to avoid psychological and physiological distress and indignity, "emotional stress, depression and reduced sense of well-being" can constitute an irreparable injury. *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988). *See also Enyart*, 630 F.3d at, 1165 (irreparable harm where there is the "the loss of the chance to engage in normal life activity"); *Tamara*, 964 F. Supp. 2d at 1087 (psychological and physical harm is irreparable injury).

Plaintiffs will suffer irreparable harm if they are removed from Ashby West and Ashby Shellmound without being provided a suitable accessible alternative location to reside. Plaintiffs' stability at the Ashby encampments has been instrumental in getting plaintiffs connected to necessary services, which will ultimately connect them to housing. (Rogers Decl. ¶ 31.) If forced to move, plaintiffs will end up in more dangerous locations, like the streets or the Wood Street encampment in Oakland, which is an encampment that is also on Caltrans right of way. (Martin Decl. ¶ 7; Myers Decl. ¶ 11.) Moving creates the significant risk if not the certainty of being disconnected from the services that will get them housed. (Coddington Decl. ¶ 3; ECF No. 54-13 at ¶ 26.) As demonstrated by the move from Seabreeze to the Ashby encampments, it is time consuming to reinitiate services when people are unsettled.

---

Displacement also means psychological and physical harm for plaintiffs. As Mr. Myers describes, being forced to move is overwhelming and it causes him feelings of anxiety that last for months. (Myers Decl. ¶¶ 10, 11.) It is hard for him to regain stability. (Myers Decl. ¶¶ 10, 11.) That plaintiffs will scatter if forced to move without a suitable accessible alternative location is more certain now when there is no meaningful potential for indoor shelter until the City of Berkeley takes over the Rodeway Inn in June. (Henson Decl ¶ 44.)

## B. The Immediate Injury to Plaintiffs Outweighs Any Hypothetical Harm That a Preliminary Injunction Might Cause the Defendants

The Court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. If a plaintiff can only show that there are serious questions going to the merits – a lesser showing than a likelihood of success on the merits-then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor and the other two *Winter,* factors are satisfied. *Shell Offshore,* 709 F.3d at 1291.

As defendants have repeatedly complained to the court, an injunction has been in place preventing them from removing the Ashby encampments (with the exception of one area with encampment interfered with a construction project) for eight months since June 2021. In all that time, defendants have been hard-pressed to point to any harm that they have suffered. The harm that Caltrans has cited in status updates, such as people breaking into electrical grids and garbage build up, are mitigatable harms if Caltrans would allow Where Do We Go Berkeley to place solar panels or generators at the encampments and if Caltrans would install garbage cans or dumpsters and fund regular garbage abatement. Such funds appear available through Caltrans' Clean California grant program. Caltrans has so far refused such clean up efforts, with the dubious rationale that it would somehow indicate its acquiescence in a more permanent occupation of their property.

In all the time the Ashby encampments have been in existence, they have not grown. (ECF No. 122.) In fact, the numbers of people living there has decreased. (ECF No. 122.) No one has been hurt at Ashby West, crossing the offramp, although here again, Caltrans would be in a position of mitigate real danger by allowing the placement of signs warning motorists to

slow down. There is no reason to believe Caltrans would suffer any further harm by a preliminary injunction for the time necessary to find accessible shelter for the people remaining at the Ashby encampments.

### C.    Plaintiffs Have Raised "Serious Questions on the Merits" of Their Americans with Disabilities Act Claims.

Because plaintiffs face a likelihood of irreparable harm and the balance of hardships tips sharply in their favor, they need only establish "serious questions on the merits in order to obtain preliminary injunctive relief." *See Cottrell*, 632 F.3d at 1132; *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2014). This "serious questions" standard requires a "lesser showing than likelihood of success on the merits," and it is more than met here. *See Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (lesser showing).

To prevail on a claim of disability discrimination under the ADA's Title II, Plaintiffs need only show: (1) that they are people with disabilities; (2) that they are "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities"; (3) that they were "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity"; and (4) that "such exclusion, denial of benefits, or discrimination was by reason of [their] disability." *McGary*, 386 F.3d at 1265 (internal citations omitted).

Here, there is no question that plaintiffs are individuals with disabilities. *See* 42 U.S.C. § 12102(1) (defining disability); 42 U.S.C. § 12102(4) (broad construction). (*See also* ECF No. 78-11.). There is also no question that, as members of the general public who happen to be homeless, they are "qualified" to participate in or receive the benefit of any Caltrans "service, program, or activity" pertaining to homeless encampments, such as the ones at issue in this case. *See* 42 U.S.C. § 12131(2).

Plaintiffs' claims of discrimination are also amply supported by the record, and in accordance with well-established law in the Ninth Circuit—which has repeatedly held that the law's prohibition against disability discrimination by public entities "brings within its scope anything a public entity does," *Cohen v. Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) (quoting *Lee*, 250 F.3d at 691), and that "[e]ven facially neutral government actions that apply equally to

disabled and nondisabled persons may violate Title II if the public entity has failed to make reasonable accommodations to avoid unduly burdening disabled persons."[3] *Id.* at 700 (citations omitted).

### 1. The American with Disabilities Act Applies to "Anything a Public Entity Does," and Caltrans' Program is Not Exempt.

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "Courts must construe the language of the ADA broadly in order to effectively implement [this] fundamental purpose." *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1172 (9th Cir. 2002); *see also Cohen*, 754 F.3d at 695 (noting the broad construction).

This case concerns Title II of the ADA, which prohibits public entities from discriminating against people with disabilities and demands that they not be "excluded from participation in or be denied the benefits of the services, programs, or activities" that public entities offer. 42 U.S.C. § 12132.

For over two decades, the Ninth Circuit has held that Title II's prohibition against discrimination "brings within its scope '**anything a public entity does**.'"[4] *Lee*, 250 F.3d at 691 (emphasis added) (quoting *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 & n. 5 (3d

---

[3]     A claim of disability discrimination under the ADA's Title II involves four elements: (1) that plaintiffs are people with disabilities; (2) that they are "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities"; (3) that they were "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity"; and (4) that "such exclusion, denial of benefits, or discrimination was by reason of [their] disability." *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (citation omitted). Caltrans does not contest that the individual plaintiffs are people with disabilities, and because they are members of the public to whom the agency's encampment-related enforcement activities are directed, there is no question that they are "qualified" to receive the benefit of those activities; Caltrans fails to point to any "essential eligibility requirement" that Plaintiffs do not meet. *See* 28 C.F.R. § 35.104 (defining "qualified individual").

[4]     "**Congress specifically rejected an approach that could have left room for exceptions to [Title II's] prohibition on discrimination by public entities.**" *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir. 1999) (hereinafter "BAART") (emphasis added).

---

Cir.1997), *aff'd* 524 U.S. 206 (1998)); *see also Cohen*, 754 F.3d at 695.[5] As the Court explained in *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002), "[a]ttempting to distinguish which public functions are services, programs, or activities, and which are not, would disintegrate into needless hair-splitting arguments." 292 F.3d at 1076 (citation and internal quotation marks omitted). The focus of a court's inquiry is thus not on whether a "particular public function can technically be characterized as a service, program, or activity," but rather on "whether it is **a normal function of a governmental entity**." *Id*. (emphasis added) (citation and internal quotation marks omitted); *see also, Hason*, 279 F.3d at 1171-73 (medical licensing); *BAART*, 179 F.3d at 731–32 (zoning).

Critically, the Ninth Circuit has expressly found that Title II of the ADA applies to a public entity's **enforcement activities**—holding in *Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir. 1996) that the law can require reasonable modification of a facially-neutral administrative regulation the "enforcement [of which] burdens" people with disabilities "in a manner different and greater than it burdens others," 81 F.3d at 1482, 1484, and in *McGary,* that "municipal code enforcement can constitute a benefit of the services, programs, or activities of a public entity under Title II." 386 F.3d at 1269. In rejecting a narrow construction of Title II's coverage, it held that there is "no reason to distinguish" between a public entity's enforcement activities and "other mandatory activities [] found to fall within the purview of the ADA." *McGary,* 386 F.3d at 1268.

Plaintiffs' claim that Caltrans' encampment-related activities are covered by Title II is in line with this precedent, and supported by ample evidence in the record – including Caltrans' own June 2021 Guidance, which contains a comprehensive set of policies and practices for how "Caltrans employees, CHP officers, and local partners [are] to prioritize and address encampments on Caltrans-owned property." (ECF 35-1 at 1.) The policies and practices memorialized in this Guidance are plainly "normal functions of a public entity" (Caltrans), and

---

[5]      The ADA was intended to "extend[] the antidiscrimination prohibition embodied in section 504 [of the Rehabilitation Act of 1974] to **all actions** of State and local governments." 28 C.F.R. Pt. 35, App. B (Department of Justice Guidance) (emphasis added); *see also* H.R.Rep. No. 101–485(II) at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added).

---

as such they are subject to Title II in the same way that government activities related to enforcement of nuisance abatement ordinances, animal quarantine regulations, and zoning requirements are. *McGary,* 386 F.3d at 1268 (nuisance); *Crowder*, 81 F.3d at 1482, 1485 (quarantine); *BAART*, 179 F.3d at 731-33 (zoning).

Caltrans' Guidance identifies four priority levels for encampments, with Priority Level 1 being the highest priority for relocation. (ECF No. 35 Ex. 1 at 4.) The Guidance then specifies **how** Caltrans should address encampments at each priority level including by (1) "collaborat[ing] with local partners to help connect people living along California's freeways with critical services and shelter/housing solutions;" (2) "consider[ing] whether alternative locations in the nearby vicinity may be available," if relocation is not feasible or people are not willing to relocate; and (3) "scheduling trash collection" and helping to distribute "trash bags and sharps containers" to occupants of "lower priority" encampments."[6] Even for the highest priority encampments, Caltrans' own guidance directs it to "coordinate with local partners and experts on homelessness, working with County Continuums of Care, [] cities, the CHP, local authorities, an others to develop a relocation strategy," (ECF No. 35, Ex. 1 at 6) rather than simply pushing houseless people from place to place "without resolving the core issues associated with homelessness." (ECF No. 35, Ex. 1 at 3 ("coordinated effort" to address core issues "imperative")).

Because Caltrans' encampment-related activities are something "a public entity does," and a "normal function of a governmental entity," they are covered by Title II, and Caltrans may not conduct those activities in a way that unduly burdens plaintiffs, or that refuses to reasonably-accommodate disability-related needs.

///

///

///

---

[6] (*See* ECF No. 35, Ex. 1 at 3(collaboration); ECF No. 35, Ex. 1, at 4(trash collection); ECF No. 35, Ex. 1, at 6 (consideration of alternative locations)). (*See also* ECF No. 35, Ex. 1 at 8 ("if there is state land nearby that is safely outside of [a dangerous area] consider allowing people to shift to a nearby, safer location [as] opposed to dispersing people completely").)

1

2

**2.    An Accommodation of Extra Time to Locate Accessible Housing is Necessary, to Prevent Caltrans from forcing Plaintiffs with Disabilities Out of the Only Shelter they Have, with Nowhere Else to Go.**

3

4

A public entity's duty not to discriminate includes a duty to make "**reasonable modifications** in policies, practices, or procedures" when "necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that the modifications would fundamentally alter the nature of the service, program, or activity" in question.[7] 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). To establish the reasonableness of a requested modification, plaintiffs need only show that it "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) (citations omitted). A limited delay in a public entity's non-emergency enforcement activities—essentially, what has been requested here—is on its face a reasonable accommodation. *See McGary*, 386 F.3d 1269 (requested accommodation of extra time to comply with "enforcement activities in a manner consistent with [] disability" was facially reasonable).

5

6

7

8

9

10

11

12

13

14

"A plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim." *McGary*, 386 F.3d at 1266. Rather, "the crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced." *Id*. "The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *Id*. at 1267. Thus, "even facially neutral government actions that apply equally to disabled and nondisabled persons may violate Title II if the public entity has failed to make reasonable accommodations to avoid unduly burdening disabled persons." *Cohen*, 754 F.3d at 700. Where, as here, a public entity's policies unduly burden people with disabilities and no necessary accommodations have been made, the entity has engaged in discrimination "by reason [their] of disability." *See McGary*, 386 F.3d at 1266-68; *Crowder*, 81 F.3d at 1484.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[7]    Similarly, it has held that the terms "reasonable accommodation" (as used in Title I of the ADA) and "reasonable modification" (as used in Titles II and III) "do not differ in the standards they create." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999), *as amended* (Nov. 19, 1999).

While Caltrans' policy and practice of sweeping encampments when the only identified alternative is congregate shelter may be workable for some houseless people, it unduly burdens those—like the individual plaintiffs—whose mental health disabilities prevent them from living in such settings. For such people, the "option" of congregate shelter is no option at all, because **they realistically cannot live in a congregate setting**—meaning that they are effectively denied the "benefit" of Caltrans' comprehensive encampment-relocation scheme, and left with nowhere to go, and no time to work with local service providers to find options that meet their mental health needs.

In *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004), this Court upheld a preliminary injunction based on a similar showing of undue burden, finding that "state action [which] disproportionately burdens the disabled because of their unique needs [is] actionable under the ADA," and that the closure of a hospital would "deny certain disabled individuals meaningful access to government-provided services because of their unique needs, while others would retain access to the same class of services." 357 F.3d at 998. Similarly here, the individual plaintiffs' unique mental health needs mean they have no meaningful access to encampment-relocation "program" Caltrans has put in place: while nondisabled individuals "retain access" to those relocation services and may be placed in suitable shelter, plaintiffs will in all likelihood be forced into increasingly isolated and dangerous situations because of Caltrans' failure to identify accessible alternatives or give plaintiffs the time needed to find them.[8] *See id*.

In such a situation, an accommodation of a limited amount of extra time to locate alternative shelter before being evicted is both necessary and reasonable. *See McGary*, 386 F.3d at 1269–70. As this Court found in *McGary*, being allowed "sufficient time to comply" with a

---

[8]     As plaintiffs argued at hearing, "Caltrans has a program . . .in their guidelines for encampment management. All we are saying is that those interim guidelines, the program they have, the activities they have, have to accommodate the people with disabilities. And there are two accommodations. One of them is there has to be enough time for those people with disabilities because it's harder to place people with disabilities. It takes more time. [The other is] you can't have a one-size-fits all solution. [. . . Caltrans is] supposed to work with cities to find a place, [and] if the only place is not accessible then that doesn't accommodate their disabilities." (ECF No. 87 at 28:18-29:3.)

---

*Where Do We Go Berkeley v. Caltrans*, No. 21-CV-04435-EMC
Plaintiffs' Motion for Preliminary Injunction - 18

public entity's "enforcement activities in a manner consistent with . . . disability" can itself be a "benefit" of a public entity, as well as a required reasonable accommodation. *See id.* (finding that "the 'benefit' [plaintiff] sought . . . was to be allowed sufficient time to comply with the City's code enforcement activities in a manner consistent with his disability"). That is precisely what Plaintiffs seek here, and *McGary*—which similarly involved a public entity enforcement scheme that burdened the disabled plaintiff "in a manner **different from and greater than**" the nondisabled—is on point. *Id.* at 1256 (emphasis added); *see also Crowder*, 81 F.3d at 1484 (noting same).

> ### 3. Allowing Plaintiffs to Remain Where They are for up to Four More Months—or Restoring the *Status Quo ante Litem* by Allowing Them to Return to "Seabreeze" for the Same Period—would not Fundamentally alter Caltrans' Encampment-Relocation Program.

Whether a necessary modification would fundamentally alter the nature of a service, program, or activity "is an affirmative defense," on which public entity defendants bear the burden of proof. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004); *see also* 28 C.F.R. § 35.130(b)(7)(i). Further, the fundamental nature of Caltrans' encampment-related activities is a question to be determined by this Court—Caltrans cannot simply assert that some aspect of its current encampment-relocation Program is "fundamental." *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004) (determining that the "nature of the service provided by" a theater was "screening films"); *Martin v. PGA Tour, Inc.*, 204 F.3d 994, 1000 (9th Cir. 2000), *aff'd*, 532 U.S. 661, 683 n.39 (2001) (determining that golf tournament provided a "competition in shot-making"); *Lamone*, 813 F.3d at 504 (determining that absentee voting was a separate program, distinct from the state's voting program as a whole).

In considering a fundamental alteration defense, the Supreme Court has expressly rejected the contention that "all the substantive rules . . . are sacrosanct and cannot be modified under any circumstances." *Martin*, 532 U.S. at 689. To the contrary, courts must "carefully weigh the purpose, as well as the letter, of [a given] rule before determining that no accommodation would be tolerable." *Id.* at 691; *see also Crowder*, 81 F.3d at 1485 (court must

determine whether "the decision reached by the state authority is appropriate under the law and in light of proposed alternatives"); *McGary*, 386 F.3d at 1270 (noting that court must consider purpose of nuisance law—"protection of the community" from disease, danger, rodents, toxic runoff, and other hazards—in determining whether requested accommodation was susceptible to an affirmative defense); *Hindel*, 875 F.3d at 348–49 (weighing the purpose of requiring voting on voting machines, rather than online, in considering a fundamental alteration defense); *Mary Jo C.*, 707 F.3d at 159 (noting that courts must "analyze the importance" of existing program elements, rather than "defer[ring] automatically" to current program design). Allowing plaintiffs to remain where they are for up to four more months as they work with community partners to locate suitable housing would not fundamentally alter Caltrans' encampment-relocation Program or defeat that Program's purpose in any way.[9] As the Court noted in its earlier Order, "there have been different people living in the encampments over the years, and as of this date, no serious injuries or harms have occurred."[10] (ECF No. 88 at 9.) This is still true. (Rogers Decl. ¶ 2.) And, to the extent Caltrans has concerns about waste, trash, and the like, those could easily be addressed by allowing portable bathrooms and dumpsters to be temporarily located in the current encampment areas, as the Court recognized at the February 22, 2022, Case Management Conference. (ECF No. 122.) Moreover, WDWGB is willing and able to help mitigate any health and safety risks at the encampment, including by providing portable bathrooms, generating electricity, providing fireproof tents, and cleaning up – all it needs is cooperation from Caltrans, and permission to do so. (Rogers Decl. ¶¶ 32-34.)

Alternatively, the Court could enter an injunction requiring Caltrans to allow Plaintiffs to return to some portion of the old "Seabreeze" site for the same period of time (four months, or

---

[9]     On the contrary, the Program's stated goals and purpose expressly **include** working with community partners to "develop a relocation strategy;" (ECF No. 35, Ex. 1 at 6); rather than simply pushing houseless people from place to place "without resolving the core issues associated with homelessness." (ECF No. 35, Ex. 1 at 3.)

[10]     While Plaintiffs acknowledge this Court's previous observation that "the balance of hardships shifts in Caltrans' favor over time," (ECF No. 88 at 12), there is nothing to indicate that allowing plaintiffs to remain in place for four more months would convert Caltrans into a provider of housing, or otherwise fundamentally alter its encampment-relocation Program—as discussed in more detail below.

---

until they are able to locate alternative shelter). This option would actually be a return to the *status quo ante litem* in this case,[11] and it is arguably one that would be far better for both plaintiffs and Caltrans, in terms of safety, cleanliness, and access to services.

Neither of these options would amount to a fundamental alteration of Caltrans' encampment relocation Program. As noted above, Caltrans' guidance already contemplates "consider[ing] whether alternative locations in the nearby vicinity may be available," if relocation is not feasible or people are not willing to relocate; and instructs the agency to "coordinate with local partners and experts on homelessness, working with County Continuums of Care, [] cities, the CHP, local authorities, an others to develop a relocation strategy" even when relocating people from the highest-priority encampments, (ECF No. 35, Ex. 1 at 6), rather than simply pushing houseless people from place to place "without resolving the core issues associated with homelessness." (ECF No. 35, Ex. 1 at 3.)

Caltrans' Guidance also already expressly directs staff to "consider allowing people to shift to a nearby, safer location [as] opposed to dispersing people completely," "if there is state land nearby that is safely outside of [a dangerous area]." ECF NO. 35, Ex. 1, page 8. At least some portions of the old Seabreeze site surely meet this criteria, as the California Department of General Services ("DGS") has already identified portions of the old Seabreeze site as "excess state land . . . that can be used by local partners, including tribal governments, counties, cities, or nonprofit agencies, on a short-term emergency basis to provide shelter for individuals or homeless. (ECF No.  55 at Ex. 1 (Newsom Order ); *id*. at Ex. 2, (Map of Seabreeze).)

At the time it was swept, the Seabreeze encampment had already existed for at least two

---

[11]     This case arose as a result of Caltrans' eviction of plaintiffs from the Seabreeze encampment, and its failure to reasonably accommodate their disability-related need for additional time to find alternative shelter. (*See* ECF No. 88 at 21:22-24 (finding that "Caltrans closed the Seabreeze and Downstairs encampments in August 2021, which led to the migration of the eleven individual plaintiffs to Ashby/Shellmound and Ashby West.").) Allowing plaintiffs to return to Seabreeze would thus mark a return to the *status quo ante litem*. *See GoTo.com*, 202 F.3d at 1210. This is so even if Caltrans would be required to take some affirmative action to return plaintiffs to the Seabreeze site. *See Faison v. Jones*, 440 F. Supp. 3d 1123, 1131 (E.D. Cal. 2020) (holding that removing a ban on plaintiffs would restore the status quo "that existed before [d]efendant began its allegedly unlawful conduct.").

years. (ECF No. 78-2 at 28:13-29:6.) There was no sudden danger that required it to be swept in August of 2021, and there is no credible safety or other rationale that would prevent Caltrans from allowing plaintiffs to reestablish a spatially-limited and temporary encampment at that site now. As this Court has already noted, "WDWG was willing to manage a temporary encampment at Seabreeze to mitigate safety risks, including limiting the number of campers, providing portable bathrooms, generating electricity, providing fireproof tents, and cleaning up." (ECF No. 88 at 9 n. 2.) WDWGB is still willing and able to do all of that, thus mitigating Caltrans' various concerns. (Rogers Decl. ¶ 32-34.) Notably, this would not require Caltrans itself to do anything new or additional—all it would need to do is identify some portion of the Seabreeze site to which Plaintiffs could temporarily return, and give WDWGB permission to provide portable bathrooms, generators, and other basic services at that site for a limited time.

Giving plaintiffs and other homeless people with disabilities time to locate appropriate shelter instead of evicting them with nowhere else to go is not only consistent with Caltrans own guidance on encampments (as detailed above), but also with recent agency initiatives and state funding decisions. Contrary to Caltrans assertions that it has no role in helping combat California's homelessness crisis, the agency has just appointed a new "Housing and Homelessness Solutions Lead, and has a budget of $2.7 million for "encampment relocation coordination and homeless services liaisons," along with a total of a total $45.6 million to remove hazardous material and "clean up encampments." (RJN, Ex. 1at 12.) Such funding could easily be used to help keep a small encampment at either Ashby or Seabreeze clean and hazard-free for five months, and hopefully, to assist in relocating plaintiffs even sooner than that.

### D.   Serious Questions Have Been Raised as to Plaintiffs' Claim for Violation of Their Substantive Due Process Rights to Be Free from State Created Danger.

The danger posed by Caltrans' proposed closure of the Ashby encampments persists. As they described in their August 30, 2022, moving papers, plaintiffs are still at threat of living on the streets if displaced, without sanitation and without services or meaningful assistance. This risk is more certain now that Horizon is not open to accepting new residents. (Henson Decl. ¶

44.) Even were plaintiffs able to go into a congregate shelter, there is no shelter to go into—and by September, it will be closed. (Henson Decl. ¶ 21.)

A plaintiff's right to be free from such state-created danger protects her from the government's effort to close an encampment and dismantle shelters. *See, e.g.*, *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) (addressing the substantive due process right to be free from the state's proposed action to demolish shelter at the onset of winter weather). This is certainly true where the closure and disbursement of homeless residents will occur during a pandemic that is seeing rates increase amongst the unsheltered. *Sausalito/Marin Cty. Chapter of California Homeless Union*, No. 21-CV-01143-EMC, 2021 WL 783571, at *8–9.

It remains true that Caltrans' proposed closure of the Ashby encampments place plaintiffs in known and obvious danger, a violation of their substantive due process rights. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989)) ("It is [] well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced.") Plaintiffs remain at risk of being scattered to more dangerous locations. (ECF No. 54-13 at 26.) Caltrans is aware of this risk, aware that they have a suitable alternative land on which plaintiffs can reside, and disregards that risk by proceeding with its plan to close the Ashby encampments without offering Seabreeze as an alternative. Plaintiffs and all the residents of the encampment are at risk of losing what little remains of their access to material support rendered by charitable originations and ordinary citizens that sustain homeless individuals suffering with disabilities, mental illness, aging, and the like. Health, safety, survival, and support for a life on the street depend on service providers' ability to serve these communities until permanent, affordable, safe, and private housing is achieved.

///

1

**E.    A New Preliminary Injunction Is in the Public Interest.**

2      "The public interest analysis for the issuance of a preliminary injunction requires us to

3   consider whether there exists some critical public interest that would be injured by the grant of

4   preliminary relief." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)

5   (internal quotations omitted). In past arguments, Caltrans has argued that there is a public

6   interest in a "safe, efficient, and reliable transportation infrastructure" that is not served by

7   plaintiffs' residing on its right of way. (ECF No. 80 at 25:20-25.) However, Caltrans points to

8   no real harm from plaintiffs' presence, beyond complaints from motorists requesting that

9   Caltrans remove the encampment because it is unpleasant to look at. (ECF No. 116 at Ex. C.)

10  Plaintiffs agree that the location of the encampments is not without unnecessary risk, and that

11  the surplus land identified by Caltrans and designated by the Department of General Services

12  as suitable for temporary homeless shelter—Seabreeze—is a preferable location. However, "as

13  other courts have held, the constitutional rights of homeless individuals outweigh the potential

14  hurdles the injunction might pose to the City's efforts to keep the sidewalks clean." *Garcia v.*

15  *City of Los Angeles*, 481 F. Supp. 3d 1031, 1051 (C.D. Cal. 2020).

16      Homeless individuals in Berkeley must indeed reside somewhere. Even as some state-

17  wide restrictions aimed at reducing the spread of COVID-19 ease, the CDC's guidance that

18  municipalities do not close encampments unless individualized housing offers are made

19  remains unchanged. And even were Horizon an accessible option, referrals are now being done

20  on a "case by case basis" and there is not information available to plaintiffs about the number

21  of beds available. (Henson Decl. ¶ 44.) Such a placement would be inherently temporary as

22  Horizon is shuttering in September. (Henson Decl. ¶ 21.)

23      The public interests identified by plaintiffs at the issuance of the Court's first injunction

24  remain compelling and served by the new injunction sought. The interests of the general public

25  that it be protected from community spread of the coronavirus, and the interest of the general

26  public for residents living on state land to be in locations where services are readily available,

27  including garbage pickup for the health of residents and the surrounding community, and

28  housing navigation, so that homeless residents can get indoors remain compelling public

interests served by the injunction. Plaintiffs have satisfied their burden for the issuance of a
preliminary injunction.

**IV.     CONCLUSION**

For the foregoing reasons, the Court should grant plaintiffs' preliminary injunction.


Dated: March 4, 2022                    SIEGEL, YEE, BRUNNER & MEHTA


                                        By   _/s/ EmilyRose Johns_____
                                           EmilyRose Johns


                                        Attorneys for Plaintiffs