UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHERE DO WE GO BERKELEY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF TRANSPORTATION (CALTRANS), et al., <br><br> Defendants. | Case No. 21-cv-04435-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Docket Nos. 125, 137 |

In September 2021, the Court issued a preliminary injunction in favor of the 11 individual plaintiffs and 16 others who lived with and/or provided support to the individual plaintiffs. That order enjoined Defendants from closing two encampments known as Ashby West and Ashby/Shellmound. The preliminary injunction lasted for six months, *i.e.*, until March 23, 2022. *See* Docket No. 88 (order). Currently pending before the Court is Plaintiffs' motion for an extension of the preliminary injunction, specifically, for another four months. For the motion, the parties have filed briefs and supporting evidence. The Court held an evidentiary hearing on the motion on March 23, 2022, during which witnesses provided testimony and counsel presented further argument. Taking into consideration all of the above, the Court hereby **GRANTS** in part and **DENIES** in part the motion and extends the preliminary injunction until April 30, 2022.[1]

**I.    FACTUAL & PROCEDURAL BACKGROUND**

A.    Prior Preliminary Injunction Order

The instant action was filed in June 2021. *See* Docket No. 1 (complaint). At that time, the

---

[1] At the hearing on March 23, the Court extended the preliminary injunction until the time that it could issue this order.

1    complaint included 6 individuals as plaintiffs. In August 2021, a first amended complaint was
2    filed, which dropped the 6 individual plaintiffs from the pleading. *See* Docket No. 48 (FAC).
3    However, in September 2021, a second amended complaint was filed which added 11 new
4    individuals as plaintiffs. The 11 individuals had been living at Seabreeze and/or Downstairs but
5    moved to the area at issue after Caltrans closed these encampments. *See* Docket No. 77 (SAC).

6    On September 27, 2021, the Court issued a preliminary injunction in favor of the 11
7    individual plaintiffs. The injunction also covered 16 non-plaintiffs who lived with the 11 plaintiffs
8    and/or provided support to them. In other words, the injunction protected 27 people total. *See*
9    Docket No. 88 (Order at 13). In its order, the Court held that the 11 individual plaintiffs had
10   sufficiently established a likelihood of irreparable harm without a preliminary injunction.
11   Although spots for the plaintiffs had been offered at Horizon, a congregate shelter run by the City
12   of Berkeley, most of the plaintiffs explained "why Horizon is not a viable alternative: they have
13   mental impairments which, *e.g.*, make living in big groups in close proximity to others or living
14   near strangers extremely difficult." Docket No. 88 (Order at 6). The Court noted that a number of
15   the plaintiffs "articulated what on their face appear to be valid concerns." Docket No. 88 (Order at
16   6) (citing declarations submitted Ms. Garcia, Mr. Myers, Ms. Teague, and Ms. Jackson). A
17   declaration from a licensed clinical psychologist supported the plaintiffs' position, although the
18   Court acknowledged that she did not personally interview or examine the individuals. *See* Docket
19   No. 88 (Order at 7).

20   Turning to the hardship to Defendants and/or the public if a preliminary injunction were
21   issued, the Court acknowledged "notable safety risks associated with the encampments at issue,"
22   including

> risk to driver safety (because the encampments are visual distractions and because trash from the encampments can make its way onto the shoulder and the traveled part of the highway); risk to camper safety (because, to access some parts of the area, campers must cross offramps); electrical issues (because some campers have broken into Caltrans electrical cabinets and boxes to get power, which can trip breakers, overload circuits, and/or otherwise cause electrical faults, which can in turn impact Smart Corridor display signs and the ramp meter system); fire risk (because some campers use open flames and because the encampments make landscaping maintenance more difficult); and environmental issues (because

campers generate trash and human waste).

Docket No. 88 (Order at 8).

Because of these risks, it was clear that the encampments could not remain on Caltrans property permanently, a position that even Plaintiffs did not assert. Camping adjacent to on and off ramps of an interstate freeway creates a precarious scenario, unlike many other homeless encampments. The Court recognizes that, over the years, various people have lived in the encampments at issue and no serious injuries or harms have yet occurred. But as a long term site, this land is untenable. The Court nonetheless concluded that the balance of hardships at that point tipped sharply in the 11 individual plaintiffs' favor (with one exception not relevant at this point) but only for a limited time. *See* Docket No. 88 (Order at 9) ("If the eleven individual plaintiffs were afforded only *temporary* relief from eviction, the hardship and risks identified [by Caltrans], while extant, would be mitigated by a limited duration.") (emphasis added). The Court noted that with the passage of time, the balance of hardships shifts as campers are given time to find other housing arrangements and the risks identified by Caltrans from the roadside encampment grows.

The Court then analyzed the likelihood of success on the merits and determined that the 11 individual plaintiffs had established at least serious questions on the merits on their ADA claim. (The Court declined to address the claim for state-created danger.) The Court acknowledged, however, that the plaintiffs' ADA claim had limits, "most notably, where an accommodation would fundamentally alter the nature of the public entity's activities." Docket No. 88 (Order at 12). Thus, over time, not only does the balance of hardships shift but also the ADA claim weakens, both because the campers would have been afforded the accommodation of time as well the changing nature of the Caltrans site.

B.     Evidentiary Hearing for Pending Motion

Because the preliminary injunction issued by the Court was to expire on March 23, Plaintiffs moved for an extension of the preliminary injunction. Both parties submitted evidence in support of their positions – mostly written but also oral (*i.e.*, testimony was provided at an evidentiary hearing). That evidence reflects, *inter alia*, as follows.

1.     Of the 11 individual plaintiffs, 6 remain at the encampments (Mr. Coddington, Ms.

Teague, Mr. Myers, Ms. Martin, Mr. James, and Ms. Garcia).[2] To the extent Defendants contend that there is insufficient or inadmissible evidence that the plaintiffs currently reside there, the Court does not agree.

2. The six-month preliminary injunction was a factor that enabled 5 of the individual plaintiffs to find housing. This is because the plaintiffs were able to remain in one place and therefore were able to remain connected to services, including those related to housing navigation. When encampments have closed in the past, organizations assisting campers have often, if not typically, lost their connections with those persons. Even when the campers have been given burner phones, that has not prevented the loss of connections (possibly because the phones were stolen or lost).

3. The 6 individual plaintiffs that remain at Ashby West and Ashby/Shellmound appear to have some mental disabilities – *e.g.*, they feel anxious around and/or do not feel safe around strangers. The Court rejects Defendants' suggestion that the plaintiffs cannot be considered disabled unless they have concrete medical documentation to support such. It is not surprising for persons who experience homelessness not to have medical treatment. It is even less surprising that persons who experience homelessness *and* who have mental disabilities do not seek medical treatment. On the other hand, it is true that the actual documentation of disabilities remains thin even though the individual plaintiffs have had time to gather documentation.

4. Finding housing for persons with mental disabilities such as the plaintiffs takes time. The individuals need to have an "income" of some kind to pay (at least in part) for the housing. Income in the form of general assistance or SSI requires individuals to secure identification and/or social security cards and to prove they are disabled. For persons with mental disabilities, this process can be more complicated and time consuming. For instance, to get a driver's license, a person will likely need not only a ride to the DMV but also a companion at the DMV to ensure that the person feels safe so that he or she is willing to wait in line. To get a social security card, the person will need to be persuaded to give up their identification card for about

---

[2] As noted at the hearing, Mr. Walker recently received housing at Horizon. Six non-plaintiffs also remain at the encampments.

two weeks. (This is if the person uses the mail-in process, which is generally preferable because to obtain an in-person appointment can take months.) To prove disability, the person will need to be convinced to see a doctor. In addition to the above, the person will need to have his or her homelessness verified before housing can be secured, and that can be difficult as someone will have to have been in contact with the person for the past 12 months and persons with mental disabilities may not have those kinds of connections.

5. How often housing opportunities come up for persons experiencing homelessness (once all necessary documentation is provided) can vary. Alameda County maintains, in essence, a list of persons needing housing and where a person is placed on the list depends on a score that he or she is given – which, in turn, is based on the person's life conditions (*e.g.*, a person in crisis is likely to be issued a higher score). The higher the person's score, the more matches the person is likely to get and the more likely the person has a "fast track" to housing.

6. In general, if a person is "new" to the County list, he or she may get a placement within a month. For other people, the time it takes to get housing is usually two months, but the time can range from one to three months. For the individual plaintiffs here, there were several setbacks that likely impacted their ability to get housing: (1) Alameda County ended its Coordinated Entry System and established a new system, Community Queue, which eliminated the position of certain residents in the housing queue, and (2) one of the main housing placements, the Rodeway Inn, is no longer accepting new clients because its FEMA funding ends in March and it will close in April. It appears, however, that, in June, the City of Berkeley will take over the Rodeway Inn, but that is primarily intended for unhoused individuals from People's Park.

7. Notwithstanding the fact that placing unhoused campers takes time, the Court gave the individual plaintiffs six months from the issuance of the preliminary injunction to find alternative arrangements.

8. Recently, Caltrans started a program focusing on planning for housing and homelessness situations. *See* Pls.' RJN, Ex. 4 (LinkedIn pages of Caltrans employees). This appears to be consistent with Caltrans receiving funding from the state to address homeless encampments. *See* Pls.' RJN, Ex. 1 (2021-2022 California Spending Plan on Housing and

5

Homelessness) (at page 12, noting that Caltrans shall receive funding to "address encampments, including (1) $2.7 million General Fund for encampment relocation coordination and homeless services liaisons, (2) $20.6 million special funds for the removal of hazardous material at encampments, and (3) $25 million General Fund is set aside from the larger Clean California budget action to clean up encampments"). It is unclear, however, whether any of this funding will impact the camps here in the near future.

9. Both the Ashby West and Ashby/Shellmound encampments continue to pose the same risks that the Court previously identified (but enhanced with additional evidence). This includes:

- Risk to driver safety. *See* Fries Decl., Ex. D (expert report describing, *inter alia*, people regularly crossing the on/off ramps near Ashby West, the curved roadways which impact the line of sight, very dark conditions at night). Defendants also presented photos at the evidentiary hearing showing the proximity of the Shellmound encampment next to the off ramp and the likelihood of garbage and litter falling on to the ramp.
- Risk to camper safety.[3] Defendants presented new evidence of near pedestrian risks when its expert was studying the site and had a near miss.
- Electrical issues. *See* Ramirez Decl. (noting that there are two electrical cabinets and one electrical box in the area; discussing incidents of tripped breakers and overloaded circuits resulting from campers breaking into the cabinets and box).
- Fire risk. *See* Roman Decl. (describing more than 20 fire incidents from March 2020 to March 2022 in the relevant area, including encampment fires).[4]
- Environmental issues. *See* Despain Decl. (addressing trash accumulation in the area and why dumpsters have not been effective and may create fire risk; also

---

[3] Plaintiffs do not seriously dispute the risk to camper safety at Ashby West because access to and from the camp requires a person to cross on/off ramps. That there is this risk is also underscored by the fact that most organizations do not provide services at Ashby West. Of course, this only compounds problems – *i.e.*, to get services, campers from cross on/off ramps to leave Ashby West.

[4] Such a risk exists even though at least some of the individual plaintiffs have fire extinguishers.

|   |   |
|---|---|
| 1 | taking note of the financial cost of cleanup and the time devoted to cleanup that |
| 2 | could be spent on other matters). |

10. The Seabreeze encampment, when it still existed, was also not free from risk. For example, it appears that there was a significant fire there, a car accident in which a pedestrian was hit, and a sexual assault.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 65, the Court has the authority to issue preliminary injunctive relief. A preliminary injunction may issue if a plaintiff establishes: (1) that it is likely to succeed on the merits; (2) that it will likely suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). Following the Supreme Court's decision in *Winter*, the Ninth Circuit has clarified that its "sliding scale" approach to preliminary injunctive relief is still viable. That is, if the plaintiff can demonstrate the risk of irreparable injury, under the sliding scale test, the strength of the plaintiff's showing on the merits necessary to secure a preliminary injunction varies with the degree to which the balance of hardship tips in its favor. In other words, preliminary injunctive relief "'is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### B. Irreparable Harm, Balance of Hardships, and Public Interest

The 6 individual plaintiffs have established a likelihood of irreparable harm if the preliminary injunction were not extended. Most notably, if the encampments were closed, then they could lose their connections to services – *i.e.*, as Plaintiffs argue, "stability at the Ashby encampments has been instrumental in getting plaintiffs connected to necessary services, which will ultimately connect them to housing." Mot. at 11. However, this harm is not certain as there are many unhoused individuals in Berkeley who are not in encampments and still have some connection to services.

At this juncture, the balance of hardships tips in the plaintiffs' favor, but not sharply for the reasons stated herein. Ashby West, in particular, poses special concern given that access requires a person to cross multiple on/off ramps, and Shellmound borders the off ramp. As noted, with the continued passage of time, the risks identified by Defendants become more significant. It may be a matter of time before someone is hit by a vehicle.

C.  Likelihood of Success on the Merits

Because, at this juncture, the balance of hardships does not tip sharply in the 6 individual plaintiffs' favor, they must show some likelihood of success.

As indicated above, the 6 individual plaintiffs have made out a prima facie case that they have mental disabilities. However, that documentation is thin and there is no specific showing what will happen if they are displaced from the encampment.

The Court assumes Title II of the ADA is likely applicable here. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendants argue that Caltrans does not provide any "service" or "program" to persons experiencing homelessness. However, as Plaintiffs point out, the Ninth Circuit "construe[s] the language of the ADA broadly to advance its remedial purpose. We have explained that the broad language of Title II brings within its scope 'anything a public entity does.'" *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014). *See, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1268, 1270 (9th Cir. 2004) (indicating agreement with other circuits that there is an ADA claim where the "benefit" sought by the plaintiff is "'to be handled and transported [post arrest] in a safe and appropriate manner consistent with his disability'").

*McGary* lends support to the individual plaintiffs' position as, there, the Ninth Circuit held that the plaintiff had sufficiently stated a Title II claim "when he alleged that the City failed to reasonably accommodate his disability by denying him additional time to participate in [a] nuisance abatement program without incurring charges." *Id.* at 1269. In the case at bar, the individual plaintiffs are making a similar claim: they assert that it is a reasonable accommodation

8

for their mental disabilities for Caltrans to give them more time to find housing.[5]

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002), also provides some limited support to the individual plaintiffs. There, the court stated that the issue for Title II "is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Id.* at 1076. Here, there is an argument that it is a "normal" function for Caltrans to deal with homeless encampments because Caltrans prepared and issued Interim Guidance on Encampments, and the agency was given significant monies from the state budget to address homeless encampments. On the other hand, Caltrans's acknowledgement that extraordinary circumstances have created encampments does not necessarily render encampments by a freeway off ramp "normal." This especially so with respect to the situs of the encampments here. Unlike the parks and streets of a city historically open to the pedestrian public, the site of a freeway off ramp is not.

Assuming Title II is applicable, the gist of the individual plaintiffs' ADA claim here is that their mental disabilities should be accommodated by giving them more time to make alternate housing arrangements. The likelihood of success on this claim presents a close call. As noted, the individual plaintiffs have already been given over six months since the preliminary injunction was issued. Thus, one could argue that, effectively, reasonable accommodation has been provided here. *Cf. McGary*, 386 F.3d at 1269 (plaintiff stated Title II claim based city's failure to accommodate him by not giving him sufficient time to comply with nuisance abatement order).

Moreover, as indicated above, the individual plaintiffs' ADA claim effectively has a time constraint.

> In the instant case, the longer the accommodation is (*i.e.*, giving more time for disabled persons to relocate), the stronger the argument Defendants have that Caltrans's property is being fundamentally altered to that of providing housing, which is outside of its transportation-driven duties. Furthermore, as time progresses and the individual plaintiffs are given more time to find alternative

---

[5] Notably, the *McGary* court also rejected Defendants' suggestion here that the plaintiffs must "allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim." *McGary*, 386 F.3d at 1266 (stating that a plaintiff "need not allege either"). In other words, the fact that Caltrans does not want anyone to be in the areas at issue (disabled or not) is not dispositive.

9

> housing, Caltrans's duty of providing reasonable accommodation is increasingly being met.

Docket No. 88 (Order at 12) (also stating the basis for interim relief for Plaintiffs "wanes with time, and the balance of hardship shifts in Caltrans's favor over time"); *see also Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) (noting that, ordinarily, public entities are not required to "make modifications that would fundamentally alter existing programs and services"). Again, the fact that the sites here are adjacent to a freeway off ramp from which pedestrians are excluded for health and safety reasons informs the degree and speed to which a program may deemed to be fundamentally altered.[6] *Compare Bey v. Wash. Metro. Area Transit Auth.*, 341 F. Supp. 3d 1, 19 (D.D.C. 2018) (concluding that plaintiff's requested accommodation for greater time to complete his [job] assignments [*i.e.*, because of his ADHD] is, on its face, reasonable," and therefore defendant had to "demonstrate that providing additional time to the plaintiff would impose an undue burden on its operations"; denying summary judgment because defendant "has offered no evidence that speed is an essential element of the bus mechanic job").

D.  Extension of Preliminary Injunction

Taking into account the above considerations, given the unique nature of the freeway situs and the length of time already afforded to the plaintiffs, the Court finds that the 6 individual plaintiffs have not shown they are entitled to a four-month extension of the preliminary injunction.

To the extent the plaintiffs ask for a different injunction than before – *i.e.*, an order allowing them to re-establish an encampment at Seabreeze, the Court also denies that request.

---

[6] As before, the Court does not address the individual plaintiffs' state-created danger claim. The claim does not appear to add materially to the analysis.

For example, the likelihood of irreparable harm to the plaintiffs arises from their having mental disabilities. Without those disabilities, the process of finding housing would be easier.

To the extent the plaintiffs assert irreparable harm because closure of the encampments would put them in a more dangerous situation, the merits of that argument are debatable. The plaintiffs are already experiencing homelessness; Defendants would not be making them homeless through the closure of the encampments. Furthermore, given the risks identified for the encampments, it is not clear that the plaintiffs would be put into a materially more dangerous situation if the encampments were closed.

Finally, the Court notes that the state-created danger claim requires deliberate indifference, and, arguably, here Defendants have not acted with deliberate indifference because they have engaged in some effort to assist the plaintiffs.

10

That would at this point essentially constitute a mandatory injunction, changing the status quo ante.

To afford the individual plaintiffs a reasonable amount of time to make alternate arrangements and to avoid imminent hardships, the plaintiffs have until April 30, 2022, before the preliminary injunction is terminated.

### III.    CONCLUSION

For the foregoing reasons, the preliminary injunction remains in place but will terminate on April 30, 2022.

This order disposes of Docket Nos. 125 and 137.

**IT IS SO ORDERED**.

Dated: April 6, 2022

_____
EDWARD M. CHEN
United States District Judge